IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

SHANNON C. DICKINSON,

                Plaintiff,

      v.

NATHAN YORK, *et al.*,

                Defendants.

_____

Civil Action No.
9:16-CV-0152 (LEK/DEP)

APPEARANCES:

OF COUNSEL:

FOR PLAINTIFF:

SHANNON C. DICKINSON, *Pro Se*
16-A-4567
Green Haven Correctional Facility
P.O. Box 4000
Stormville, N.Y. 12582

FOR DEFENDANTS:

JOHNSON & LAWS, LLC
648 Plank Road, Suite 204
Clifton Park, N.Y. 12065

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

GREGG T. JOHNSON, ESQ.
APRIL J. LAWS, ESQ.
COREY A. RUGGIERO, ESQ.
LORAINE C. JELINEK, ESQ.

<u>REPORT AND RECOMMENDATION</u>

This is a disability discrimination and civil rights action brought by *pro se* plaintiff Shannon C. Dickinson, a prison inmate, pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102 *et seq.*; section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 701 *et seq.*; and 42 U.S.C. § 1983. Although plaintiff is now in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), he was a pre-trial detainee being held by defendant Warren County ("County") at the time of the events giving rise to this action. Plaintiff's third amended complaint, the currently operative pleading, alleges that defendant Warren County and some of the individuals employed by the County discriminated against him due to his disability and violated his due process rights under the Fourteenth Amendment while he was confined in the Warren County Correctional Facility ("WCCF").

Currently pending before the court is a motion brought by the defendants requesting the entry of summary judgment dismissing plaintiff's third amended complaint based on various grounds, including that plaintiff failed to exhaust the available administrative remedies prior to commencing this action. For the reasons set forth below, I recommend that the motion be granted.

I.    BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the DOCCS and confined in a New York State prison facility. Dkt. No. 101. At the times relevant to this action, however, plaintiff was a pre-trial detainee confined in the WCCF located in Lake George, New York. Dkt. No. 23 at 2-3.

Plaintiff "is a paraplegic who suffers from complete paralysis in both legs and [has] no feeling from the chestline and below."[2] Dkt. No. 23 at 1. Due to his paralysis, plaintiff is bound to a wheelchair and needs assistance transferring to and from his wheelchair, including when he needs to ride in a vehicle, shower, or get into bed. *Id.*; Dkt. No. 83-7 at 2-3. Plaintiff alleges that, while a pre-trial detainee at the WCCF, he was transported out of the prison for court appearances on several occasions between August 2015 and April 2016. Dkt. No. 23 at 2; Dkt. No. 83-5 at 4; Dkt. No. 83-7 at 16. Although plaintiff alleges in his third amended complaint that he was transported in a patrol car and "was unassisted in all transfers" to and from his wheelchair while entering and exiting the car, Dkt. No. 23 at 2, 7, there is evidence in the record suggesting that WCCF corrections officers would

---

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2    In 1991, plaintiff shot himself in the neck, causing a spinal cord injury and resulting in paralysis. Dkt. No. 83-7 at 2.

stabilize the wheelchair while plaintiff lifted himself to and from his wheelchair. *See, e.g.,* Dkt. No. 83-5 at 4; Dkt. No. 83-9 at 3; Dkt. No. 83-11 at 3.

Plaintiff alleges that, on January 4, 2016, he injured his neck and back when he slipped getting out of the patrol car and into his wheelchair. Dkt. No. 23 at 8-9; Dkt. No. 83-7 at 12-13. Specifically, he claims that he felt something "pop[] in [his] neck and back" and that, although he had experienced a shoulder dislocation in 1990 and a torn rotator cuff in 2010, until the incident on January 4, 2016, he had never experienced a popping sensation in his neck and back. Dkt. No. 83-7 at 9-13.

Plaintiff also alleges that he was deprived of proper clothing "for over 4 months" while confined in the WCCF. Dkt. No. 23 at 8; Dkt. No. 83-5 at 19. In particular, plaintiff was required to wear a full jumpsuit, although he did not wear the portion designed to cover his torso. *Id.* Instead, plaintiff sat on the top half of the jumpsuit, which became a hazard when he transferred out of his wheelchair because it could become caught on his wheelchair, risking a fall. Dkt. No. 23 at 8; Dkt. No. 83-5 at 19.

Finally, plaintiff contends that he was denied a "safe shower chair" during his stay in the WCCF. Dkt. No. 23 at 8. The record reveals, however, that a waterproof wheelchair that plaintiff could use in the shower was

purchased on August 26, 2015, shortly after his arrival at the facility. Dkt. No. 83-4; Dkt. No. 83-21 at 4.

The record now before the court reflects that plaintiff filed a grievance while confined in the WCCF concerning the lack of access to a wheelchair-accessible van on or about November 12, 2015. Dkt. No. 83-5 at 4. The grievance was reviewed by Corrections Officer Tourge, who is not a named defendant in this action, and determined it to be unfounded. *Id.* at 5. Plaintiff's appeals of that decision to the Chief Administrative Officer and the Citizen's Policy and Complaint Review Council ("CPCRC") were denied. *Id.* at 2, 6. Plaintiff also filed a grievance requesting a two-piece uniform on or about September 17, 2015. *Id.* at 19. That grievance was accepted on September 22, 2015, *id.* at 20, and plaintiff did not appeal that decision.[3]

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on February 10, 2016, by the filing of a complaint. Dkt. No. 1. Shortly thereafter, he filed an amended complaint, which was reviewed by Senior District Judge Lawrence E. Kahn pursuant to 28 U.S.C. § 1915A. Dkt. No. 6. In a decision issued on April 28, 2016, Judge Kahn dismissed the plaintiff's amended complaint, with leave to replead. *Id.*

---

[3]      There is evidence in the record that, on September 22, 2015, a two-piece prison uniform was ordered for him and was expected to arrive by the end of October 2015. Dkt. No. 83-5 at 20, 23.

Plaintiff availed himself of the opportunity to amend, filing a second amended complaint on May 25, 2016. Dkt. No. 9. That complaint was accepted for filing, except that two of plaintiff's claims asserted against certain named defendants were dismissed. Dkt. No. 10.

On September 28, 2016, plaintiff submitted a motion for leave to amend his second amended complaint. Dkt. No. 20. The court granted that motion, and plaintiff's third amended complaint was accepted for filing on November 29, 2016. Dkt. No. 22.

Plaintiff's third amended complaint names the following individuals and/or entities as defendants: (1) Nathan York, Warren County Sheriff; (2) Warren Corrections Officer Neil Mason; (3) Warren Corrections Officer Christopher Green; (4) Warren Corrections Officer Richard Reynolds; (5) Warren Corrections Officer Keven Smith; (6) Warren Corrections Officer Jordan Pond; (7) Warren Corrections Officer Michael Harpp; (8) Warren Corrections Officer James Trottier; (9) Warren Corrections Officer Christopher Slater; (10) Warren Corrections Officer Michael Curtis; (11) Warren Corrections Officer Keenan Wittenberg; (12) Warren Corrections Officer Curtis Lemelin; (13) Warren Corrections Officer William Sorensen; (14) Warren Corrections Officer Mattison; (15) Warren Corrections Officer

Michael Allison; (16) Warren Corrections Officer Hill;[4] (17) Warren

Corrections Officer Cynthia Vandenburgh; (18) Warren Corrections Officer

Whitney Hoerter; (19) Warren Corrections Sergeant Derek Keays; (20)

Warren Corrections Lieutenant Daniel Clifford; (21) Warren Corrections

Lieutenant Albert Maday; (22) Warren County; and (23) Warren Corrections

Sergeant Wayne Farmer.[5] Dkt. No. 23 at 3-4. Liberally construed, the third

amended complaint asserts causes of action against all defendants for

violations of his rights under the ADA, RA, and Fourteenth Amendment to

the United States Constitution. *See generally* Dkt. No. 23.

Following the close of discovery, defendants filed the currently pending

motion for summary judgment. Dkt. No. 83. Defendants contend that

plaintiff's third amended complaint should be dismissed because, *inter alia*,

plaintiff failed to exhaust the available administrative remedies prior to filing

this action and, in any event, defendants provided plaintiff reasonable

accommodations and there is no evidence to support a factfinder's

---

[4]       It is apparently not clear to defendants whether plaintiff intended to name
Corrections Officer John Hill or Corrections Officer Michael Hill as a defendant in this
action. Dkt. No. 83-1 at 3. It is not necessary for the court to resolve this question,
however, to decide the pending motion.

[5]       The clerk of the court is respectfully directed to change the court's records to
reflect the correct spelling of the last name of defendants Hoerter (Dkt. No. 83-18 at 1),
Sorensen (Dkt. No. 83-27 at 1), Trottier (Dkt. No. 83-28 at 1), and Wittenberg (Dkt. No.
83-30 at 1).

conclusion that they violated plaintiff's due process rights. *See generally* Dkt. No. 83-32. Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 90, and defendants have submitted a reply. Dkt. No. 96. Defendants' motion is now fully briefed and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250. When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Exhaustion of Available Administrative Remedies

In support of their motion, defendants contend that all of plaintiff's claims are subject to dismissal in this action because plaintiff failed to exhaust the available administrative remedies prior to filing his original complaint. Dkt. No. 83-32 at 12-15.

1.    Governing Legal Principles

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the

10

plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[6]

The administrative grievance program at the WCCF is governed by Title 9 of the Compilation of Codes, Rules, and Regulations of the State of New York. 9 N.Y.C.R.R. § 7032.1. In accordance with the governing regulations, an inmate must file a grievance within five days of the date of the act or occurrence giving rise to the grievance. 9 N.Y.C.R.R. § 7032.4(d). Within five business days of receipt of the grievance, the facility's grievance coordinator must then issue a written determination. 9 N.Y.C.R.R. § 7032.4(i). The inmate has two business days from the date he receives the grievance coordinator's decision to appeal to the facility's chief administrative officer. 9 N.Y.C.R.R. § 7023.4(j). The chief administrative officer, in turn, then

---

[6]    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

has five business days to issue a determination on the inmate's appeal. 9 N.Y.C.R.R. § 7023.4(k). If the inmate is not satisfied at that point, he has three business days to appeal the chief administrative officer's determination to the State Commission of Correction. 9 N.Y.C.R.R. § 7032.5(a). The facility grievance coordinator has three days after he receives the inmate's notice of appeal to forward the appeal, the investigation report, and all other pertinent documents to the CPCRC. 9 N.Y.C.R.R. § 7032.5(b). Generally, the CPCRC is required to issue a written determination within forty-five business days of the receipt of the grievance and investigatory materials. 9 N.Y.C.R.R. § 7032.5(c).

If a plaintiff fails to follow each of the required steps of the prescribed administrative grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a)

provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[7]  *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third

---

[7]     According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

    2. <u>Analysis</u>

      a. <u>Plaintiff's Request for a Wheelchair-Accessible Van</u>

   Plaintiff filed a grievance on November 12, 2015, requesting that he be "transported to and from court" in a "wheelchair equipped van," rather than a police patrol car, so he would not have to transfer himself to and from his wheelchair. Dkt. No. 83-5 at 4; *see also* Dkt. No. 83-7 at 27. That grievance is identified in the record as grievance number 2015-1245. Dkt. No. 83-5 at 4. The grievance was determined to be unfounded by Corrections Officer Tourge on November 16, 2015. Dkt. No. 83-5 at 5. Plaintiff appealed that determination on the same date to the WCCF Chief Administrative Officer, who affirmed the decision on November 17, 2015. *Id.* at 6. Plaintiff then appealed that determination to the CPCRC on November 18, 2015. *Id.*; Dkt. No. 83-7 at 27-28. Although New York State regulations mandate that the CPCRC issue a decision on an inmate's appeal within forty-five business days of its receipt of such an appeal, on April 24, 2016, plaintiff filed a second grievance, grievance number 2016-0401, complaining that he had

not yet received a response from the CPCRC to his appeal of grievance number 2015-1245. Dkt. No. 83-5 at 15. Grievance numbers 2015-1245 and 2016-0401 were both then forwarded to the CPCRC on April 20, 2016, and April 29, 2016, respectively. *Id.* at 3, 14. The CPCRC finally responded, denying plaintiff's grievances, on June 9, 2016. *Id.* at 2, 13.

Plaintiff filed his original complaint in this action on or about February 10, 2016. Dkt. No. 1. Because the CPCRC did not issue its decision on plaintiff's appeal of grievance numbers 2015-1245 and 2016-0401 until four months later after this action was commenced, it is clear that plaintiff did not fully exhaust the available administrative remedies concerning his request for a wheelchair-accessible van. Dkt. No. 83-5 at 2, 13; *see Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("[S]ubsequent exhaustion after suit is filed therefore is insufficient."), *overruled on other grounds, Nussle*, 534 U.S. at 516.

Plaintiff, however, contends that the administrative procedure was not available to him because the CPCRC did not respond to his appeal within the forty-five day timeframe required by the governing regulations. Dkt. No. 90 at 3-6. Courts in this circuit have decided this question differently, largely depending upon the amount of time that elapses between the inmate's appeal and the appeal determination. *Compare Rodriguez v. Favro*, No. 14-

CV-0418, 2016 WL 1253848, at *5-6 (N.D.N.Y. Mar. 9, 2016) (Peebles, M.J.)

*report and recommendation adopted by* 2016 WL 1261120 (N.D.N.Y. Mar,

30, 2016) (Hurd, J.) (finding that the grievance procedure was available to

the plaintiff even where the CPCRC issued its decision almost three months

beyond the forty-five day time limit provided for in the regulations);[8]  *with*

*Torres v. Carry*, 672 F. Supp. 2d 338, 345 (S.D.N.Y. 2009) (finding that the

grievance procedure was unavailable to plaintiff because "the final

administrative decision maker ha[d] lost [the plaintiff]'s appeal or has

otherwise neglected, almost four years after [the plaintiff] claims he filed his

appeal, to issue a final administrative determination").

   In this case, although six months passed between the time plaintiff filed

his appeal to the CPCRC and the issuance of the CPCRC's decision, Dkt.

No. 83-5 at 2, 6, two critical facts lead me to conclude that the administrative

procedure remained available to plaintiff in this case. Plaintiff signed his

appeal to the CPCRC on November 18, 2015. *Id.* at 6. The regulations state

that the grievance coordinator must submit the pertinent materials to the

CPCRC within three business days of receiving notice of the inmate's

appeal, and that the CPCRC then has forty-five business days from the date

---

[8]      All unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff.

that it receives the pertinent grievance materials from the facility grievance coordinator to render a determination. 9 N.Y.C.R.R. §§ 7032.5(c), 7032.5(d)(1). Had the regulations been strictly followed, and assuming the CPCRC received plaintiff's appeal on November 23, 2015, the latest plaintiff should have received a response from the CPCRC is January 29, 2016. Plaintiff, therefore, only waited approximately one additional week beyond the timeframe set forth in the regulations before filing his complaint in this action.[9] Dkt. No. 1. No court in this circuit that has decided that an administrative procedure was unavailable to an inmate because the final determination was not rendered within the specified regulatory timeframe, and none have contemplated that any delay, regardless of its length, automatically renders the administrative procedure unavailable to a prisoner. In my view, a one-week delay is not unreasonable such that it would make a prison grievance procedure unavailable to the plaintiff under the PLRA and *Ross.*

Moreover, although the regulations do not specifically articulate what an inmate can or should do in the event a decision on his appeal is not rendered within the specified timeframe, it is plain from the record that

---

[9]    It is worth noting in this context that, although the court received plaintiff's original complaint on February 10, 2016, plaintiff signed the pleading on February 3, 2016. Dkt. No. 1 at 5.

plaintiff could have filed a grievance complaining of the CPCRC's non-response, but did not do so until April 24, 2016, long after he filed his complaint in this action. Dkt. No. 83-5 at 15-16. Upon receiving grievance number 2016-0401, which complained of the CPCRC's non-response to plaintiff's appeal of grievance number 2015-1245, the grievance coordinator promptly forwarded it to the CPCRC. *Id.* at 14. Given this series of events, it appears clear that the administrative procedure at the WCCF remained available to plaintiff even when the CPCRC failed to provide a written response to plaintiff's appeal within the forty-five day period outlined in the regulations.

For the reasons discussed above, I find that plaintiff did not exhaust the available administrative remedies prior to filing this action concerning his request for a wheelchair-accessible van.

> b.    Plaintiff's Requests for a Two-Piece Uniform and Waterproof Wheelchair

Plaintiff also contends that he was denied safe prison attire and a shower-appropriate wheelchair while he was incarcerated at the WCCF. Dkt. No. 23 at 8. There is no record evidence, however, demonstrating plaintiff appealed a grievance concerning either of those complaints to the CPCRC. Instead, the record reveals that officials at the facility ordered plaintiff a two-piece uniform in or around mid-October 2015, and that they ordered him a

waterproof, shower-ready wheelchair on or about August 26, 2015. Dkt. No. 83-3 at 3; Dkt. No. 83-4 at 2; Dkt. No. 83-5 at 23. Accordingly, I recommend defendants' motion be granted to the extent it requests dismissal of plaintiff's claims concerning his prison uniform and a waterproof wheelchair on the ground that plaintiff did not fully exhaust the administrative remedies.

IV.   SUMMARY AND RECOMMENDATION

Defendants cite several grounds for dismissal of plaintiff's third amended complaint, including plaintiff's failure to exhaust the available administrative remedies prior to filing this lawsuit. Because it is clear based on the record that plaintiff did not exhaust the prescribed grievance process before filing this action, and that the administrative procedure remained available to him at all times, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 83) be GRANTED; and it is further

ORDERED that the clerk modify the court's records to reflect the correct spelling of the following defendants' last names: (1) defendant Trottier, (2) defendant Wittenberg, (3) Lemelin, (4) defendant Sorensen, and (5) defendant Hoerter.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this

report.[10]  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this court's

local rules.

Dated:     August 6, 2018
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

---

[10]    If you are proceeding *pro se* and are served with this report and
recommendation by mail, three additional days will be added to the fourteen-day
period, meaning that you have seventeen days from the date the report and
recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If
the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then
the deadline is extended until the end of the next day that is not a Saturday, Sunday, or
legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2016 WL 1253848
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael J. Rodriguez, Plaintiff,
v.
Dave Favro, et al., Defendants.

Civil Action No. 9:14-CV-0418 (DNH/DEP)
|
Signed 03/09/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: MICHAEL J. RODRIGUEZ, Pro
Se, 14-A-3203, Southport Correctional Facility, Box 2000,
Pine City, NY 14871.

FOR DEFENDANTS: LEMIRE, JOHNSON &
HIGGINS, LLC, P.O. Box 2485, 2534 Route 9, OF
COUNSEL: GREGG T. JOHNSON, ESQ., BRADLEY
J. STEVENS, ESQ., Malta, NY 12020.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

**\*1** Pro se plaintiff Michael J. Rodriguez, who is now
a New York State prison inmate, has commenced this
action against Clinton County, Clinton County Sheriff
David Favro, and Jail Administrator Michael Smith,
pursuant to 42 U.S.C. § 1983, alleging that the defendants
deprived him of his civil rights by denying him the right
to freely exercise his chosen religion in violation the First
Amendment. Plaintiff's claims relate to a directive by
officials at the Clinton County Jail ("CCJ") prohibiting
Rodriguez, a Rastafarian, from wearing a religious head
covering at certain times within the facility.

Currently pending before the court is a motion brought
by defendants seeking the entry of summary judgment
dismissing plaintiff's complaint. For the reasons set forth
below, I recommend that defendants' motion be granted.

I. *BACKGROUND* [1]

Plaintiff is a prison inmate currently being held in
the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS")
at the Southport Correctional Facility ("Southport"),
located in Pine City, New York. *See generally* Dkt. No.
32; Dkt. No. 26–6 at 2. Prior to his incarceration with the
DOCCS, including at the times relevant to his claims in
this action, plaintiff was confined at the CCJ. *See generally*
Dkt. No. 1.

On February 13, 2014, plaintiff was booked into the CCJ
after being charged with promoting prison contraband in
the first degree. Dkt. No. 2612 at 2; Dkt. No. 26–13 at
2. That charge related to the drug suboxone. [2] Dkt. No.
26–6 at 5. Plaintiff's felony history included prior charges
of robbery in the first degree, criminal possession of a
controlled substance, and promoting prison contraband.
*Id.*

As a general rule, at the time plaintiff was confined in
the CCJ, inmates were allowed to wear certain religious
head coverings in accordance with their sincerely held
religious beliefs. Dkt. No. 26–12 at 2; Dkt. No. 26–13
at 2. Those head coverings could be worn throughout
the facility, subject to physical search and inspection
by officials for concealed contraband. *Id.* Pursuant to
the established policies and practices at the facility, the
rule can be modified based on the specific security risk
an inmate poses at the time of booking or throughout
his incarceration at the facility. *Id.* Inmates who are
mobile or transferred throughout the facility present
the greatest security risks due to the possibility of
obtaining contraband from other inmates. Dkt. No. 26–
12 at 2; Dkt. No. 26–13 at 3. Searches of inmates
during movement pose additional security risks because
the officers conducting the searches cannot divert their
attention from the search to observe other inmates. Dkt.
No. 26–12 at 3; Dkt. No. 2613 at 4.

**\*2** The booking sheet prepared for plaintiff by CCJ staff
upon his entry into the jail on February 13, 2014, reflected
that he is a Rastafarian. Dkt. No. 26–3 at 4. In accordance
with his religious beliefs, plaintiff contends that his head
should be covered at all times unless he is "stepping into
the temple" or washing his head. Dkt. No. 26–6 at 6–8.
Plaintiff does not wear his head covering, which he refers
to as a crown, in the shower or when he prays. Dkt. No.
26–6 at 7–8; Dkt. No. 28 at 3. Plaintiff's crown measures
approximately eleven inches in length and eleven inches

in height. Dkt. No. 26–4 at 2–3; Dkt. No. 28–3 at 17–18. During plaintiff's booking, Corrections Officer Dragoon, who is not a named defendant, told plaintiff that there was a policy in place at the facility regarding religious head-coverings and that plaintiff was not permitted to wear his crown throughout the entire facility. Dkt. No. 26–6 at 19; Dkt. No. 28–1 at 2. In response, plaintiff asked to speak with a supervisor, and was advised that he could file a grievance regarding the issue. *Id.*

During his incarceration at the CCJ, plaintiff was permitted to wear his crown in his cell and housing unit, but not outside of his housing unit. Dkt. No. 26–13 at 3. In particular, due to security risks, plaintiff was not allowed to wear his crown during facility movements. *Id.*; Dkt. No. 26–6 at 11. Plaintiff was required to remove his crown when he used the law library, engaged in recreation, transferred cells, or attended court appearances. Dkt. No. 16–13 at 3; Dkt. No. 26–6 at 15–16. Plaintiff voluntarily chose to use the law library and participate in recreation with the knowledge that he would not be permitted to wear his crown while engaging in those activities. *See, e.g.*, Dkt. No. 26–6 at 16.

Over the period of his incarceration at the CCJ, plaintiff used the law library seven times and was transported to court on approximately five or six occasions. [3] Dkt. No. 26–6 at 15–16; Dkt. No. 26–8. During each visit to the law library and court, plaintiff was not permitted to wear his crown. Dkt. No. 26–6 at 15–18. In addition, plaintiff was not allowed to wear his crown when he was transferred to different cell locations or during recreation. *Id.* at 16–18. At his deposition in connection with this matter, plaintiff testified that he was transferred approximately four times, and the transfers lasted "a matter of minutes." *Id.* at 17–18.

Plaintiff was permitted to practice his religion in his cell. Dkt. No. 26–6 at 13. Plaintiff prayed every day, morning and night, for between thirty minutes and two hours. *Id.* at 13–15.

While incarcerated at the CCJ, plaintiff was involved in three fights. Dkt. No. 26–6 at 20–21. As a result of an incident on March 17, 2014, plaintiff agreed to be confined to a "24–hour lock." Dkt. No. 26–5 at 4–8; Dkt. No. 26–13 at 5. One week later, on March 24, 2014, plaintiff engaged in another altercation. Dkt. No. 26–5 at 9; Dkt. No. 26–13 at 9–14. On June 10, 2014, plaintiff was involved in a

third fight that resulted in sixty-day "lock in" sentence. Dkt. No. 26–5 at 16–25; Dkt. No. 26–13 at 5.

Plaintiff filed one grievance regarding his ability to wear his crown while confined in the CCJ. Dkt. No. 26–6 at 25. On or about February 16, 2014, the grievance was forwarded to the grievance coordinator, Sergeant Ryan ("Ryan"), who is not a named defendant. Dkt. No. 28–1 at 3; Dkt. No. 28–3 at 14. On March 7, 2014, plaintiff was interviewed by Ryan, who determined that "[j]ail [p]olicy states you may wear your crown in your cell, and housing unit. Day area." Dkt. No. 28–3 at 15. Plaintiff appealed Ryan's decision to defendant Michael Smith, the Clinton County Jail Administrator, who concluded that plaintiff "may wear [his] religious item in [his] housing unit." *Id.*; Dkt. No. 26–13 at 1. Plaintiff disagreed with defendant Smith's decision and, on March 20, 2014, appealed the determination to the Citizen's Policy and Complaint Review Council ("CPCRC"). Dkt. No. 26–10 at 3; Dkt. No. 28–1 at 3; Dkt. No. 28–3 at 15. On August 5, 2014, the CPCRC issued a decision regarding plaintiff's appeal, finding that he could exercise his beliefs and wear his crown to the extent that it "does not constitute a threat to the safety, security and good order of the facility." Dkt. No. 26–10 at 2. In March 2014, prior to receiving the decision of the CPCRC, plaintiff filed his complaint in this action. [4] Dkt. No. 2 at 5; Dkt. No. 26–10 at 2.

**\*3** On July 22, 2014, after 160 days of incarceration at the CCJ, plaintiff was transferred to the custody of the DOCCS. Dkt. No. 26–13 at 2; Dkt. No. 26–3 at 7. During his confinement at the CCJ, plaintiff was required to remove his crown for less than twenty-five hours for mandatory transports and approximately 110 hours for voluntary transports. [5] *Compare* Dkt. No. 26–14 at 5 *with* Dkt. No. 28 at 2. In total, plaintiff was not permitted to wear his crown for approximately 135 hours while confined at the CCJ. *Id.*

Plaintiff did not discuss the restrictions regarding his head-covering with defendant Dave Favro, nor did he receive any communication from that individual. Dkt. No. 26–6 at 27–28. Similarly, although defendant Smith responded to plaintiff's grievance appeal, he and plaintiff did not have any conversations regarding plaintiff's right to wear his crown. *Id.* at 28.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action with the filing of a complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge David N. Hurd issued an order granting plaintiff's IFP application and approving the filing of his complaint, subject to dismissal of all claims asserted against defendant Clinton County Jail and substitution of Clinton County ("County") in place of the CCJ as a defendant. *See generally* Dkt. No. 10.

Following the close of discovery, defendants filed a motion for summary judgment seeking dismissal of plaintiff's complaint on multiple grounds, including (1) plaintiff's failure to exhaust his administrative remedies; (2) the lack of evidence supporting plaintiff's First Amendment claims; (3) the lack of personal involvement of defendants Smith and Favro; (4) qualified immunity; and (5) the absence of any evidence from which a reasonable factfinder could conclude that defendant County promulgated a policy or custom through which any municipal actor violated plaintiff's constitutional rights. *See generally* Dkt. No. 26. Plaintiff has since responded in opposition to the motion, and defendants have submitted a reply in further support of their motion. Dkt. Nos. 28, 30. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3( c). *See* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Legal Standard Governing Motions for Summary Judgment*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *Exhaustion of Available Administrative Remedies*

In support of their motion for summary judgment, defendants contend that dismissal of plaintiff's complaint is warranted in light of the fact that plaintiff failed to exhaust the administrative remedies available to him at the CCJ prior to filing this action. Dkt. No. 26–15 at 11–13. In response, plaintiff argues that the CPCRC did not issue a timely response to his grievance appeal, filed on March 20, 2014. Dkt. No. 28–1 at 3. Specifically, plaintiff contends that, although the CCJ Inmate Handbook provides that the CPCRC will render a decision within forty-five business days, he did not receive a response to his appeal until on or about August 5, 2014, well beyond the forty-five day deadline. *Id.*; see also Dkt. No. 26–9 at 31.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison

conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [6] This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91–92; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

**\*5** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is an affirmative defense that must be raised by a defendant in response to an inmate suit. *Jones,* 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ +] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007).

A comprehensive inmate grievance process existed at the CCJ at the times relevant to this action. Dkt. No. 26–9 at 31; Dkt. No. 38–3 at 19. The policies governing that process are set forth in an inmate handbook, a copy of which plaintiff acknowledged receiving upon being processed into the jail. *Id.*; *see also* Dkt. No. 26–6 at 19. According to the procedures set forth in the

handbook, while inmates at the CCJ are encouraged first to informally communicate problems to housing unit officers, if they are unable to resolve the issue in that manner, they are instructed to complete a complaint/grievance form, which is first reviewed by a housing unit officer, and then, if unresolved, is forwarded to the grievance coordinator as part of the formal grievance process. Dkt. No. 26–9 at 31; Dkt. No. 28–3 at 19. The grievance process provides inmates with the opportunity to appeal adverse decisions of the grievance coordinator to the jail administrator, and any adverse decision from that official can be appealed to the New York State Commission of Correction. *Id.* Inmates are informed that they can expect to receive a decision receive a decision from the NYS Commission of Corrections within forty-five business days. *Id.*

In this instance, there is no dispute that plaintiff filed a grievance regarding the restrictions on wearing his head covering and appealed the adverse decision at the facility level to the CPCRC on March 20, 2014. Dkt. No. 26–10 at 3–4; Dkt. No. 28–3 at 14–17. Nor do the parties dispute that the CPCRC did not issue its decision regarding plaintiff's appeal until August 5, 2010. Dkt. No. 26–10 at 2; see also Dkt. No. 28–1 at 4. Plaintiff filed his complaint in this action, however, on March 19, 2014, well before the CPCRC rendered its decision. Dkt. No. 2 at 5. While plaintiff contends that he "filed" his complaint on March 25, 2014, Dkt. No. 28–2, that contention is legally irrelevant in light of the undisputed evidence that, even assuming he filed his complaint on that date, his complaint was filed months prior to issuance of the CPCRC's decision, and indeed well prior to expiration of the forty-five business days time within which the CPCRC is supposed to decide appeals to that body. [7] Accordingly, plaintiff failed to exhaust the available administrative remedies before filing this action. *See, e.g., Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516 (2002); *accord, Casey v. Brockley,* No. 13–CV–1271, 2015 WL 8008728, at *5 (N.D.N.Y. Nov. 9, 2015) (Dancks, M.J.), *report and recommendation adopted by 2015 WL 7864161 (N.D.N.Y. Dec. 3, 2015)* (Hurd, J.), ("Receiving a decision from CORC *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted before filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice." (emphasis in original)).

**\*6** Plaintiff's failure to exhaust administrative remedies, however, does not warrant dismissal of his complaint without further inquiry. In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate-plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. N.Y.,* 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, the record fails to reveal any basis on which plaintiff's failure to exhaust could be excused under *Hemphill* and its progeny. As is detailed above, a comprehensive inmate grievance process existed at the CCJ at the relevant times. Dkt. No. 26–9 at 31; Dkt. No. 28–3 at 19. That grievance policy was set forth in an Inmate Handbook, a copy of which plaintiff acknowledged receiving upon being processed into the prison. *Id.*; Dkt. No. 26–6 at 19. Plaintiff was familiar with that grievance process, and knew it was available to him, as evidenced by the grievance filed by him while incarcerated at the CCJ. Dkt. No. 28–3 at 14–16. Indeed, a copy of plaintiff's grievance, and his detailed recounting of the process demonstrate that, during his custody in the CCJ, the grievance process was available to him. *Id.*; Dkt. No. 28–1 at 2–3. Accordingly, there is no evidence in the record upon which a reasonable factfinder could conclude that the grievance process was unavailable to plaintiff at the relevant times.

Turning to the second inquiry, there is no record evidence that suggests defendants forfeited the exhaustion defense, and plaintiff has not alleged as much.[8]

Finally, nothing in the record suggests that special circumstances exist that could justify plaintiff's failure to exhaust the available administrative remedies. The CPCRC's failure to act within the time frame set forth in the Inmate Handbook does not constitute a special circumstance justifying plaintiff's failure to exhaust. *See, e.g., Casey,* 2015 WL 8008728, at \*6 (citing cases); *Quinn v. Stewart,* No. 10–CV–8692, 2012 WL 1080145, at \*6 (S.D.N.Y. Apr. 2, 2012) ("The administrative exhaustion requirement directs courts to evaluate solely whether grievance procedures were satisfied *at the time that an action was initially filed.*" (emphasis in original)). Accordingly, I recommend defendants' motion be granted based on plaintiff's failure to exhaust the available administrative remedies prior to filing this action.

### C. *Merits of Plaintiff's First Amendment Religious Freedom Claims*

As an alternative ground for dismissal of plaintiff's complaint, defendants contend that, based upon the record now before the court, no reasonable factfinder could conclude that defendants violated plaintiff's First Amendment rights to freedom of religion because any alleged burden upon plaintiff's religious beliefs resulting from defendants' actions is far outweighed by legitimate penological interests. Dkt. No. 26–15 at 13–15.

While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection. *See Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348–49 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990). When determining whether the decision to restrict an inmate from wearing religious headwear outside of his housing unit impinges upon that individual's

Rodriguez v. Favro, Not Reported in F.Supp.3d (2016)

2016 WL 1253848

First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin,* 905 F.2d at 574 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir. 1988).

**\*7** As a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs."[9] *Salahuddin,* 467 F.3d at 274–75. In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin,* 467 at 275. "[T]he burden [, however,] remains with the prisoner to 'show that these penological concerns were irrational.' " *Ford,* 352 F.3d at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

The court then asks whether a defendant's conduct, which allegedly deprives the plaintiff of his free exercise rights, is reasonably related to some legitimate penological interest. *Ford,* 352 F.3d at 594; *see also Washington v. Gonyea,* 538 F. App'x 23, 26 (2d Cir. 2013) ("Even if Defendants–Appellees substantially burdened [the Plaintiff–Appellant]'s sincerely held religious believes, their actions do not constitute a constitutional deprivation if they were reasonably related to legitimate penological interests." (quotation marks omitted)). To evaluate whether a challenged regulation or decision by prison officials is reasonable,[10] courts must evaluate the following four factors:

> [ (1) ] Whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [ (2) ] whether prisoners have alternative means of exercising a

burdened right; [ (3) ] the impact on the guards, inmates, and prison resources of accommodating the right; and [ (4) ] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Salahuddin,* 467 F.3d at 274 (footnote omitted).

In this case, defendants do not challenge the genuineness of plaintiff's religious beliefs. The threshold issue in this case, then, is whether the decision to limit the locations where plaintiff could wear his crown substantially abridged plaintiff's sincerely held religious beliefs. "[A] substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir. 1996) (quotation marks and alterations omitted). On the one hand, plaintiff acknowledged that he did not wear his crown continuously, throughout every day, compare Dkt. No. 26–14 at 7 with Dkt. No. 28 at 3, and plaintiff testified at his deposition that he removed his crown to shower and pray and while at his home. Dkt. No. 266 at 7–8. Moreover, plaintiff had "no problem" removing his crown for search and inspection. Dkt. No. 26–6 at 29. On the other hand, however, plaintiff contends that, according to his religious beliefs, his "head shall be covered at all times ... [out] of respect to [his] creator," except when he is in temple or praying. *Id.* at 6, 7–8, 13. In light of all of this evidence, I find that a reasonable factfinder could conclude that defendants' decision to limit where plaintiff could wear his crown substantially burdened plaintiff's sincerely held beliefs. *See Ford,* 352 F.3d at 593–94 ("The relevant question in determining whether [the plaintiff]'s religious beliefs were substantially burdened is whether participation in [a particular celebration], in particular, is considered central or important to [the plaintiff]'s practice of Islam.").

**\*8** Turning to the second prong of the analysis, and assuming that defendants' refusal to allow plaintiff to wear his crown in certain locations within the jail substantially burdened plaintiff's beliefs, I conclude that defendants have nonetheless demonstrated a compelling interest in maintaining security. The Second Circuit addressed the constitutionality of prison regulations that restricted the wearing of crowns to designated areas based upon legitimate security interests in *Benjamin v. Coughlin,* 905

F.2d 571 (2d Cir. 1990). In *Benjamin,* the defendants maintained that the size of crowns and the ease with which contraband could be smuggled, posed security concerns. *Benjamin,* 905 F.2d at 578–79. The court held that "legitimate security reasons are raised in support of the present policy. Preventing the smuggling of contraband, such as weapons and drugs, comports with the type of penological interests contemplated under the *Turner/Shabazz* standard." *Id.* at 578.

Here, defendants Favro and Smith have explained that the crown is the largest religious head covering permitted to be worn at the CCJ and, due to its size, it poses the largest risk for concealing contraband and/or weapons. Dkt. No. 26–12 at 3; Dkt. No. 26–13 at 4. While the parties disagree regarding the precise dimensions of plaintiff's crown, it is undisputed that the crown measures approximately eleven inches in length and eleven inches in height. Dkt. No. 26–4; Dkt. No. 28–3 at 17–18. Defendants Smith and Favro also explain that, while head coverings can be worn throughout the facility subject to search and inspection, the rule can be modified based on the specific security concerns that an individual inmate poses during his incarceration at the facility. Dkt. No. 26–12 at 2; Dkt. No. 26–13 at 2. They note that the times when inmates are "mobile" create the highest security risks. Dkt. No. 26–12 at 2; Dkt. No. 26–13 at 3. Conducting searches of inmates during times of movement poses security risks because, as an officer is conducting a search of an inmate, he cannot observe and watch other inmates. Dkt. No. 26–12 at 3; Dkt. No. 26–13 at 4. Although the parties disagree as to whether plaintiff was designated as "an initial security risk" at his booking, *compare* Dkt. No. 26–14 at 2 *with* Dkt. No. 28 at 1, plaintiff admits that he was processed into the CCJ in February 2014 after having been charged with promoting prison contraband. Dkt. No. 26–6 at 4. One month later, plaintiff was involved in two physical altercations with other inmates. *Id.* at 21–23; *see also* Dkt. No. 26–5 at 414. As a result of a third incident in June 2014, plaintiff received a sixty-day "lock in" sentence. Dkt. No. 26–5 at 16; Dkt. No. 26–13 at 5.

While plaintiff contends that he posed no security risk while at CCJ because "at no time while being house at [the CCJ] was [he] found to be in possession of prison contraband," Dkt. No. 28–1 at 3, such backwards reasoning does not address the potential security risk that prison staff assigned to plaintiff in light of his history of promoting prison contraband and fighting while incarcerated at the CCJ. Similarly, neither plaintiff's cooperation with prison officials during searches, nor the existence of security cameras throughout the facility, *id.* at 4–5, detract from the legitimate security risk posed by both the crown itself as a means of concealing weapons and other contraband and plaintiff, who prison officials felt posed a heightened security risk based on his past behavior. Accordingly, in light of *Benjamin* and the security considerations highlighted by defendants, I find that no reasonable factfinder could conclude that defendants' decision to limit where plaintiff could wear his crown was unreasonable or irrationally related to a legitimate penological concern. *See Jihad v. Fabian,* No. 09–CV–1604, 2011 WL 1641885, at *18 (D.Minn. Feb. 17, 2011) (holding that the prison policy prohibiting the plaintiff from wearing his kufi outside of designated areas was narrowly tailored to serving compelling interests of prison safety and security); *see also Jones v. Rowley,* No. 08–CV–1094, 2009 WL 7042244, at *4 (D. Md. April 20, 2009) ("As a matter of law, the court concludes this heightened security concern is well founded. The regulation restricting plaintiff's wearing of a ... 'crown' does not comprise a violation under [section] 1983 ... since crowns are large and may be used to conceal contraband, including weapons and drugs."); *see also Muhammad v. Lynaugh,* 966 F.2d 901, 902–03 (5th Cir. 1992) (finding that corrections officers' testimony that weapons can "easily be secreted inside a Kufi cap" was persuasive evidence that the prison regulations restricting the use of Kufi caps are reasonably related to a legitimate penological interest of prison security).

**\*9** Turning to the factor regarding whether the plaintiff had an alternative means of exercising the alleged burdened right, in this case, the court is not aware of any other means of exercising this particular religious belief other than physically wearing the crown. There is record evidence, however, demonstrating that plaintiff received some accommodations for his religious beliefs. Plaintiff was permitted to pray in his cell, at any time, without any limitations. Dkt. No. 26–6 at 13–15. In addition, he was able to wear his crown in his cell and housing unit without restriction. Dkt. No. 2613 at 3. During plaintiff's 160 days of incarceration (less than 3,850 hours) at the CCJ, plaintiff was required to remove his crown for approximately 135 hours. Dkt. No. 26–14 at 5; Dkt. No. 28 at 2. On balance, in light of the security considerations suggested by defendants, as well as the accommodations already provided to plaintiff, in my view no reasonable

factfinder could conclude that defendants' decision to refuse to allow plaintiff to wear his crown continuously throughout the facility was unreasonable. Accordingly, I recommend that plaintiff's First Amendment claim be dismissed.

### D. *Qualified Immunity*

Defendants also contend that, even if the court finds that plaintiff suffered a deprivation of his First Amendment rights, defendants Favro and Smith are protected by the doctrine of qualified immunity. Dkt. No. 26–15 at 18–20.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.,* 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001), *abrogated on other grounds by* ( *Pearson,* 555 U.S. 223)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson,* 555 U.S. at 231 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso,* 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle,* 132 S.Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are

sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi,* 764 F.3d at 230 (quoting *al-Kidd,* 131 S.Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

**\*10** In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendants Favro and Smith are entitled to qualified immunity based upon my conclusion that it was objectively reasonable for them to believe that their conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the alleged incidents, "there [was] no clearly established law requiring prisons to permit inmates to wear religious head coverings at all times." *Uhuru v. Hart,* No. 07–CV–7361, 2009 WL 3489376, at \*15 (C.D. Cal. Oct. 27, 2009) (citing *Khatib v. Cnty. of Orange,* No. 07–CV–1012, 2008 WL 822562 \*10 (C.D.Cal. Mar. 26, 2008), *reversed on other grounds by Khatib v. Cnty. of Orange,* 639 F.3d 898 (9th Cir. 2011)); *see also Benjamin,* 905 F.2d at 578–79 (upholding prison regulation that limited the prisoners' rights to wear their Rastafarian crowns to certain locations within the prison). In any event, a person in defendants' positions could have reasonably concluded that weapons or contraband might be concealed under plaintiff's crown, and, therefore, restricting plaintiff's right to wear his crown to certain locations in the jail would not violate any clearly established constitutional right. *See Nicholas v. Tucker,* No. 95–CV–9705, 2001 WL 228413, at \*2 (S.D.N.Y. March 8, 2001) (finding that the defendant was entitled to qualified immunity because an officer in the defendant's position could have concluded that contraband could have been concealed under the plaintiff's kufi). Accordingly, defendants Favro and Smith are entitled to qualified immunity.

E. *Punitive Damages*

Defendants also seek dismissal of plaintiff's punitive damages claim against defendant County. Dkt. No. 26–15 at 20. It is well established that, as a municipal entity, defendant County is not subject to exposure to punitive damages, including for claims brought under 42 U.S.C. § 1983. *Ciraulo v. City of N.Y.,* 216 F.3d 236, 238 (2d Cir. 2000) (holding that the Supreme Court's decision in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981), precludes an award of punitive damages against a municipality under section 1983). Because plaintiff's complaint asserts only claims arising under section 1983 against defendant County, I recommend that any punitive damage claim that may be considered as having been asserted against that defendant in plaintiff's complaint be dismissed.

IV. *SUMMARY AND RECOMMENDATION*

Because plaintiff failed to file and pursue to completion a grievance regarding the claims asserted in his complaint prior to filing this action, he is procedurally barred from pursuing those claims in federal court. Turning to the merits of the plaintiff's First Amendment free exercise claim, I find that the record lacks any evidence from which a reasonable factfinder could conclude that any defendant violated plaintiff's rights. Moreover, even assuming that

plaintiff's clearly established constitutional rights were violated by one of the defendants Smith or Favro in this case, it was objectively reasonable for them to believe that their conduct did not violate plaintiff's rights. [11]

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 26) be GRANTED and plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 1253848

Footnotes

1   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003).

2   Suboxone is a prescription drug used for the treatment of opiate dependence and is a Schedule III controlled drug under the Federal Controlled Substances Act. Dkt. No. 26–11.

3   Plaintiff filed eleven requests to use the law library, and was granted permission on seven occasions. Dkt. No. 26–8.

4   The date that plaintiff's complaint was deemed "filed" with the court is disputed and will be discussed more completely below in Part III.B. of this report.

5   While defendants have not cited any record evidence for this proposition proffered in their statement of undisputed material facts pursuant to rule 7.1(a)(3) of the local rules of practice for this court, Dkt. No. 26–14 at 5, plaintiff has admitted the proffered fact in his response to defendants' statement of undisputed material facts, Dkt. No. 26–10 at 2.

6   All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

7   It is worth noting that plaintiff's insistence that he filed his complaint on March 25, 2014 is misguided. Under this circuit's "prison mailbox rule," the date of filing is deemed to be the date that the prisoner-plaintiff delivered his complaint to a prison guard for mailing to the court, which is presumed to be the date that the complaint was signed. *Houston v. Lack,* 487 U.S. 266, 276 (1988); *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir. 2011). Thus, for the purposes of this motion, the date upon which plaintiff filed his complaint is March 19, 2014, a day before he appealed the grievance determination to the CPCRC. Dkt. No. 2 at 5.

8   Defendants asserted the exhaustion defense in their answer. Dkt. No. 20 at 3.

Rodriguez v. Favro, Not Reported in F.Supp.3d (2016)
Case 9:16-cv-00152-LEK-TWD    Document 107    Filed 08/06/18    Page 30 of 31
2016 WL 1253848

9      The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith,* 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford,* 352 F.3d at 592 (quoting *Emp't Div.,* 494 U.S. at 887); *see also Holland v. Goord,* 758 F.3d 215, 220–21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

10     Indeed, the Second Circuit has held that "[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same ways as a prison regulation denying such exercise." *Salahuddin,* 467 F.3d at 274 n.4.

11     "In light of my recommendations that defendants' motion be granted in its entirety based on plaintiff's failure to exhaust available administrative remedies, on the merits, and based upon qualified immunity, I have not addressed defendants' remaining contentions regarding plaintiff's municipal liability claim against defendant County or the personal involvement of defendants Favro and Smith."

---

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1261120
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael J. Rodriguez, Plaintiff,
v.
David Favro, Major Smith, and
Clinton County, Defendants.

9:14-CV-418
|
Signed 03/30/2016

## Attorneys and Law Firms

MICHAEL J. RODRIGUEZ, 14-A-3203, Southport
Correctional Facility, P.O. Box 2000, Pine City, NY
14871, Plaintiff pro se.

Lemire, Johnson Law Firm, P.O. Box 2485, 2534 Route
9, OF COUNSEL: Gregg T. Johnson, Esq., Bradley
J. Stevens, Esq., Malta, NY 12020, Attorneys for
Defendants.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

*1 Pro se plaintiff Lee Scott brought this civil rights
action pursuant to 42 U.S.C. § 1983. On March 9,
2016, the Honorable David E. Peebles, United States
Magistrate Judge, advised by Report-Recommendation
that defendants' motion for summary judgment be
granted, and the complaint be dismissed in its entirety. See
ECF No. 34. Plaintiff timely filed objections. See ECF No.
37.

Based upon a de novo review of the Report-
Recommendation, the Report-Recommendation is
accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendant's motion for summary judgment is
   **GRANTED**, and the complaint is **DISMISSED**; and

2. The Clerk serve a copy of this Decision and Order
   upon plaintiff in accordance with the Local Rules.

The Clerk of the Court shall enter judgment and close this
case.

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2016 WL 1261120

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2018 Thomson Reuters. No claim to original U.S. Government Works. 1