UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SHANNON C. DICKINSON,

                       Plaintiff,

      -against-                             9:16-CV-0152 (LEK/TWD)

NATHAN YORK, *et al.*,

                       Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Shannon Dickinson filed this civil rights action pro se on February 10, 2016, asserting claims arising out of his confinement as a pretrial detainee at the Warren County Correctional Facility ("Warren County C.F."). Dkt. No. 1. Plaintiff, who has paraplegia, brings claims under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., § 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, and the Due Process Clause of the Fourteenth Amendment, via 42 U.S.C. § 1983, arising from Defendants' failure to provide a wheelchair-accessible van to ensure Plaintiff's safe transportation between Warren County C.F. and outside court appearances on several occasions in 2015 and 2016, as well as other alleged denials of accommodations necessary in light of Plaintiff's paraplegia. See generally Dkt. No. 10 ("July 1, 2016 Order"). Warren County and twenty-three local officials remain as defendants in this action.[1]

_____

[1] The following official defendants remain: Sheriff Nathan York, Sergeant Wayne Farmer, Officer Mason, Officer Green, Officer Reynolds, Officer Smith, Officer Pond, Officer Harpp, Officer Trottier, Officer Slater, Officer Curtis, Officer Wittenburg, Officer Lemelin, Officer Sorensen, Officer Mattison, Officer Allison, Officer Hill, Officer Vandenburg, Officer Eldridge, Officer Hoerter, Sergeant Keays, Lieutenant Clifford, and Lieutenant Maday. Docket.

Before the Court is Defendants' motion for summary judgment, Dkt. Nos. 83 ("Motion"); 83-32 ("Defendants' Memorandum of Law"); 83-33 ("Defendants' Statement of Material Facts" or "Defendants' SMF"); 83-2 to -8 (Exhibits); 83-9 to -31 (Affidavits). Plaintiff filed a response in opposition, Dkt. Nos. 90 ("Opposition I"); 90-1 ("Opposition II"), and Defendants filed a Reply, Dkt. No. 96-1 ("Reply Memorandum of Law").[2] For the reasons that follow, Defendants' Motion is granted in part and denied in part.

## II.    BACKGROUND

### A. Factual History

Below, the Court details the facts as recounted by the parties, while noting factual disputes. The relevant events took place between July 31, 2015 and November 15, 2016, while Plaintiff was held in pretrial custody at Warren County C.F. See Defs.' SMF ¶¶ 2–3; Dkt. No. 23 ("Third Amended Complaint" or "TAC") ¶ 2.

#### 1.  Plaintiff's Disability

Plaintiff has paraplegia stemming from a spinal cord injury he suffered in 1991, and he requires the use of a wheelchair for mobility. See TAC ¶ 1;[3] Defs.' SMF ¶¶ 6, 8; Mot. Ex. F

---

[2]  On August 31, 2018, this Court granted Defendants' Motion solely on exhaustion grounds, without discussing the merits of Plaintiff's claims. Dkt. Nos. 107, 109. On October 5, 2020, the Second Circuit reversed this Court's grant of summary judgment, remanding the case for further proceedings. Dkt. No. 144. Accordingly, the Court now addresses the merits of Plaintiff's claims.

[3]  Because the Third Amended Complaint is verified, the Court treats it as a sworn affidavit for evidentiary purposes. See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e).").

("Dickinson Deposition") at 16, 26–27.[4] He has complete paralysis in both legs, no feeling in his body below his chest, and "no balance while sitting." TAC ¶ 1. Normally, between five and ten times per day, he transfers himself without assistance from his wheelchair to other surfaces, using his upper body strength. See Dickinson Dep. at 26–28, 44. For example, he often transfers himself to a shower chair, a toilet, and a bed. Id. at 26. In all such transfers, he uses a handrail to lift himself. See Dickinson Dep. at 27–28. All such surfaces have a similar height to his wheelchair and tend to be about six inches from the wheelchair during transfers. See id. at 27, 72. In these regular transfers, Plaintiff sometimes falls—as often as five times per year. See id. at 28.

      *2. Transportation*

      While incarcerated at Warren County C.F., Plaintiff was transported between the facility and the Warren County courthouse on several occasions. During these trips, he transferred between his wheelchair and a patrol car between twenty and thirty times in total. TAC ¶ 16; Dickinson Dep. at 45.

      Regarding the manner in which he was transported, certain facts are disputed and certain facts are not. Defendants acknowledge, and Plaintiff does not dispute, that at all relevant times, Warren County C.F. did not have a single wheelchair-accessible van. See Defs.' SMF ¶ 20; Dkt. No. 83-31 ("York Affidavit"). In his Third Amended Complaint, Plaintiff stated that on August 3, 12, and 26, 2015, September 30, 2015, November 2, 2015, December 9, 2015, January 4, 2016, and April 6, 11, 14, 18, and 20, 2016, he was "transported in a patrol car, unassisted in all transfers to and from the [car,] and was forced to crawl and use whatever means available to

———————————

    [4] Defendants submit excerpts from the deposition transcript. Citations to Plaintiff's deposition refer to the transcript page numbers.

[him] in order to transfer to and from his wheelchair." TAC ¶ 2. In his deposition, he recalled that

on one occasion in late March or early April of 2016, he was instructed by Officer Allison to ride

in the back seat of the patrol car on the way to a court appearance, but that he refused to do so,

because he could not get close enough to the door to enable him to transfer. See Dickinson Dep.

at 56. On that occasion, after between thirty and forty-five minutes of waiting, he was permitted

to ride in the front seat instead. Id. at 57. He recalls that on other occasions on which he traveled

to court appearances by patrol car, he rode in the front seat. Id. at 58–59.

He recounts that in the summer of 2016, Disability Rights New York ("DRNY") visited

Warren County C.F. and "demanded that [the facility] get a wheelchair van to accommodate

transferring" him. Id. at 58. Defendants acknowledge a visit by DRNY at this time upon

Plaintiff's request and appear to acknowledge that the organization made certain

recommendations regarding accommodations for wheelchair-bound inmates, without noting

precisely what those recommendations were. See York Aff. ¶ 11. After that visit by DRNY,

Plaintiff refused to ride in the patrol car to court appearances and was instead pushed in his

wheelchair to the courthouse, which was about a quarter of a mile away. Dickinson Dep. at 58.

The parties provide the following facts regarding the typical transfer process to and from

the front seat of the patrol car. By Plaintiff's recollection, the process of transferring from the

wheelchair to the front seat, and the process of transferring back, each typically took three to

five minutes. Id. at 59–60. During these transfers, the front seat was typically roughly six inches

lower than the wheelchair and a foot or more away. Id. at 72. Plaintiff recalled that the "same

procedure" was followed during each transfer. Id. at 61. By Plaintiff's account, transfers were

difficult specifically on account of the distance between the wheelchair and the car. See

4

Dickinson Dep. at 113.

Defendants attest to certain additional details regarding the manner in which Plaintiff was transferred to and from the patrol car for these visits to the courthouse. Certain defendants, each of whom at some time assisted in transporting Plaintiff to at least one court appearance, provide affidavits in which they recite the following identical passage:

> When Plaintiff was transported in the patrol car an officer would hold and stabilize his wheelchair as he transferred himself from the wheelchair to the passenger seat of the patrol car. At no point did Plaintiff have to crawl from his wheelchair to the patrol car. Further, he received assistance as needed and had his wheelchair positioned right next to the passenger seat to make the transfer as easy as possible. Plaintiff was able to transfer himself from the wheelchair to the passenger seat and from the passenger seat to the wheelchair, and never fell during any such transfers.

See, e.g., Dkt. Nos. 83-9 ("Allison Affidavit") ¶¶ 7–8; 83-11 ("Curtis Affidavit") ¶¶ 7–8; 83-12 ("Eldridge Affidavit") ¶¶ 7–8.

Plaintiff appears to agree with some aspects of this account and not others. In his deposition, he stated equivocally that typically, an officer might have held his wheelchair in place as he transferred from the patrol car to the wheelchair, and that he was not sure whether anyone did so when Plaintiff was transferred from the wheelchair to the car. See Dickinson Dep. at 60. Plaintiff does not concede that he additionally received assistance "as needed." See TAC ¶ 2; Dickinson Dep. at 59–60.

Contrary to Defendants' account, Plaintiff maintains that he was injured during one transfer from the patrol car to his wheelchair. In his Third Amended Complaint, he alleged that on January 4, 2016, he "injured his right shoulder/back" while attempting to transfer from the patrol car to his wheelchair and "was taken to the facility medical department." TAC ¶ 23. In his

5

deposition, he stated that he "slipped" while transferring from the car to his wheelchair, and that "something popped in [his] neck and back." Dickinson Dep. at 42.

Defendants present two sets of videos from November 4, 2015, one set of a transfer to the patrol car, from both in front of the vehicle and behind, and the other set of a transfer back to the wheelchair, also taken from both the front and the back of the patrol car. Mot. Ex. E ("Videos"). Defendants maintain that these videos are representative of all transfers. See Defs.' SMF ¶ 31. In the first video, depicting a patrol car entry, Plaintiff can be seen pushing his wheelchair to the patrol car's passenger-side front door, which an officer then opens. See Video I, 9:42:18 AM–9:42:36 AM. Plaintiff then pushes himself closer to the front seat, between the open door and the seat. See id., 9:42:36 AM–9:42:42 AM. A second officer then grabs onto the back handles of the wheelchair and appears to hold the wheelchair in place. See id., 9:42:42–9:42:44. For the next thirty seconds or so, Plaintiff careens several times between the wheelchair and the front seat, repeatedly lifting himself with his arms and falling back into the wheelchair, then appears to sit partially in the car seat, and afterwards appears to adjust himself several times until he is fully seated inside the car. See id., 9:42:44–9:43:15. During this period, each officer at different times leans in towards Plaintiff, although it is difficult to discern whether either is physically assisting him. See id. The video continues for several additional minutes after Plaintiff is seated in the car, during which time the two officers disassemble Plaintiff's wheelchair and place it in the trunk of the car. See id., 9:43:15–9:46:56.

The second set of videos, which capture a transfer from the patrol car back to the wheelchair, depict the following. First, an officer opens the passenger-side front door of the patrol car. See Video II, 10:31:57–10:31:59. Leaving the door open, that officer joins another

6

officer at the rear of the patrol car, where the two of them remove the wheelchair's parts from the trunk and assemble the wheelchair, after which one of the officers pushes the assembled wheelchair to the open passenger-side door. See id., 10:31:59–10:32:56. After about forty seconds, see id., 10:32:56–10:33:31, the transfer process begins. First, one officer pushes the wheelchair up to the passenger-side seat. See id., 10:33:31–10:33:33. Then, while one officer holds the top of the wheelchair and the other appears to reach for the bottom of the wheelchair, Plaintiff attempts several times to lift himself into the wheelchair, apparently unsuccessfully. See id., 10:33:33–10:33:51. Subsequently, both officers appear to hold Plaintiff by the right arm and attempt to pull him upwards and sideways into the wheelchair, unsuccessfully. See id., 10:33:51–10:34:05. Plaintiff sits back down for a moment, after which the officers successfully lift him into the chair, this time with one officer holding Plaintiff's right arm while the other holds the left side of Plaintiff's body, with Plaintiff adjusting himself several times in the process. See id., 10:34:05–10:34:15. The video continues for almost two more minutes, during which time the officers adjust the chair and close the patrol car door, and Plaintiff wheels himself away. See id., 10:34:15–10:35:58.

Aside from this video evidence, Defendants highlight certain pre-existing medical issues with Plaintiff's right shoulder. See Defs.' Mem. of Law at 15–16. Plaintiff acknowledged in his deposition that he dislocated his right shoulder in 1990 while playing football, and that he subsequently underwent physical therapy that relieved his pain after a short time. See Dickinson Dep. at 36–37. He also recalled that he was diagnosed with a torn rotator cuff in his right shoulder in 2010, after which he received physical therapy and cortisone injections. Id. at 37–38. Surgery was recommended to him by some medical professional at some time in 2014 or 2015,

prior to his incarceration at the Warren County C.F., but he declined surgery, because he wished to avoid an extended period of rehabilitation. Id. at 38. Plaintiff also stated that he sometimes experiences shoulder pain attributable to "wear and tear" from regular transfers to and from the wheelchair. Id. at 43–44. Plaintiff contends, however, that he newly experienced pain after the January 4, 2016 injury, during which he felt something "pop[]" in his neck and back, and that he had never before had such an experience in transferring from his wheelchair to any other surface. Id. at 42.

Plaintiff has further stated that, after the date of the injury, he filled out dozens of medical slips requesting medical assistance related to this injury. TAC ¶ 25. Defendants submit a copy of a March 9, 2016 grievance Plaintiff filed in which he mentioned the January 4, 2016 injury and complained of pain in his shoulder and back. See Mot. Ex. D at 10. Subsequent to the January 4, 2016 incident, Plaintiff states that he received two "shots" to relieve "serious pain" in his back. TAC ¶ 25. Warren County C.F. "has sent [P]laintiff to a nerve doctor to see if [P]laintiff has a pinched nerve and has taken an x-ray." Id. He was still experiencing pain in his "right back/shoulder" at the time the Third Amended Complaint was filed. Id.

By Plaintiff's account, he made numerous requests to various local and state officials, in and outside of Warren County C.F., to provide him with a wheelchair-accessible van. As he recounted in his deposition, he "wrote the medical department, the Commission of Correction[], the Attorney General, [and the] Inspector General," among others. Dickinson Dep. at 76. He additionally stated that he made between thirty and forty verbal requests for a wheelchair-accessible van "[t]o every person that walked through the door," or, in other words, to various officials he encountered at Warren County C.F. Id. at 81. He also submitted two formal

grievances in which he requested a wheelchair-accessible van, one on November 12, 2015, and the other on April 24, 2016. Id. at 82; Defs.' SMF ¶¶ 34–36; Mot. Ex. D at 4, 15.

### 3. Shower Chair

Separately, Plaintiff alleges that he was denied a shower chair. TAC ¶ 22. Slater submits an affidavit in which he attests that, shortly after Plaintiff's arrival at Warren County C.F., Plaintiff requested a waterproof chair to enable him to shower without assistance, and that the Warren County Sheriff's Office provided Plaintiff with a waterproof chair within one month of his admission. Dkt. No. 83-25 ("Slater Affidavit") ¶¶ 14–16. Defendants submit an invoice dated August 26, 2015 for the purchase of such a chair. Mot. Ex. C. Slater attests that during the one month before Plaintiff received a waterproof chair, he was assisted by medical or correctional staff with showering. Slater Aff. ¶ 16. Plaintiff does not contest any of these facts.

### 4. Uniform

Second, Plaintiff alleges that he was denied an alternative, two-piece prison uniform that was necessary in light of his paraplegia. TAC ¶ 22. He stated in his Third Amended Complaint that he was issued the standard, one-piece uniform and was "deprived . . .of proper clothing for over 4 months," during which time he "was wearing a full jumpsuit only on [his] legs," with the top half of the jumpsuit "under his buttocks." Id. It appears that he wore the one-piece uniform this way because he was unable to pull the jumpsuit over his hips, which would have required him to stand up. See Dkt. No. 9 ("Second Amended Complaint") ¶ 35. Plaintiff describes two resulting complications. First, the uniform sometimes caught on his wheelchair while he was transferring into or out of the wheelchair, which presented a risk of injury. See Mot. Ex. D at 19; TAC ¶ 22; Defs.' SMF ¶ 49. Second, his buttocks would at times be exposed while he was

transferring to and from the wheelchair, causing humiliation. See TAC ¶ 22.

Plaintiff submitted a grievance regarding this issue on September 17, 2015. See Mot. Ex. D at 19. A report dated September 22, 2015 notes that this grievance was accepted and that "Correction Administration . . . is in the process of ordering a two piece uniform for [Plaintiff]." Id. at 20. Plaintiff recalls that after two or three weeks, he received a set of used clothes, which he wore under the understanding that they would have to be returned to Washington County once new clothes were ordered. See Dickinson Dep. at 111. Plaintiff submitted another grievance on October 16, 2015, in which he reported that he had still not received a two-piece suit. See Mot. Ex. D at 22. Plaintiff voided the grievance on October 20, 2015, by his account, because he was told that the two-piece suit would be ordered. See Dickinson Dep. at 101–02. On some unspecified date, Plaintiff was provided with a two-piece jumpsuit. See id. at 109. He recalls that this initial set of clothes was too small. See id. at 110. Defendants have submitted invoices indicating that a set of shirt and trousers was purchased on October 27, 2015 and received on November 2, 2015, and that a second set was ordered on December 22, 2015 and received on December 28, 2015. Mot. Ex. B.

**B. Claims**

At this stage, the following claims remain: (1) claims under the ADA and Rehabilitation Act against all defendants, based on the denial of access to a wheelchair-accessible van, denial of a waterproof chair for showering, and denial of a two-piece uniform; (2) claims under the Due Process Clause of the Fourteenth Amendment, via § 1983, against all defendants, arising from the same events; and (3) a Monell claim against Warren County.[5] Plaintiff seeks money damages,

---

[5] See Monell v. Dept. of Soc. Servs., 436 U.S. 658 (1978).

10

as well as injunctive relief in the form of "appropriate accommodations." TAC ¶ 38.

## III.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary

judgment if "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the

outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or

unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see

also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact

could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis

for the motion and identifying those portions of the record that the moving party claims will

demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party

has failed "to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its

initial burden, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all

reasonable inferences in favor of the nonmoving party. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.'" <u>Macera v. Vill. Bd. of Ilion</u>, No. 16-CV-668, 2019 WL 4805354, at *8 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (quoting <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV.   DISCUSSION

### A.  ADA and Rehabilitation Act Claims

*1. Standards*

Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act requires that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Because the elements of Plaintiff's ADA and Rehabilitation Act claims for disability discrimination are the same, the Court considers these claims together and applies a single analysis to both. <u>See, e.g.</u>, <u>Rodriguez v. City of New York</u>, 197 F.3d 611, 618 (2d Cir. 1999) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem.").

A plaintiff can establish a violation under both statutes by demonstrating that he has been

12

denied a reasonable accommodation necessary in light of his disability to enable his "meaningful access" to a program or service. See B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152, 158 (2d Cir. 2016) ("Exclusion or discrimination may take the form of disparate treatment . . . or failure to make a reasonable accommodation."); Henrietta D. v. Bloomberg, 331 F.3d 261, 280 (2d Cir. 2003) ("A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought.") (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985)). A plaintiff must (1) establish that he has a qualifying "disability," (2) demonstrate that he lacks access to a given government resource due to his disability, and (3) suggest a plausible accommodation to remedy that lack of access. See Meekins v. City of New York, N.Y., 524 F. Supp. 2d 402, 407 (S.D.N.Y. 2007). A plausible accommodation is one "the costs of which, facially, do not clearly exceed its benefits." Henrietta D., 331 F.3d at 280 (quoting Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995)).

The third prong entails a burden-shifting framework. See Wright v. New York State Dep't of Corr., 831 F.3d 64, 76 (2d Cir. 2016). Once the plaintiff meets his burden to demonstrate that his requested accommodation is facially reasonable, the burden then shifts to the defendant to rebut the reasonableness of the plaintiff's proposed accommodation. See id. This burden "is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship." Id. (internal alterations and quotation marks omitted). At that stage, a defendant has the opportunity to demonstrate that a proposed accommodation is unreasonable, because it would "fundamentally alter the nature of the service provided" or "impose an undue financial or administrative burden." See Henrietta D.,

331 F.3d at 281.

    *2. Analysis*

    Defendants do not dispute that Plaintiff has a disability, namely, paraplegia. See generally

Defs.' Mem. of Law; see also Sayers v. City of New York, No. 04-CV-3907, 2007 WL 914581,

at *7 (E.D.N.Y. Mar. 23, 2007) ("As a paraplegic, plaintiff is disabled within the meaning of the

disability statutes."). The parties dispute whether Plaintiff has been denied meaningful access to

any government resource, and, specifically with respect to his request for a wheelchair-

accessible van, whether his proposed accommodation is reasonable.

    a.  Transportation

    Plaintiff argues, correctly, that he has a statutory right to safe transportation in a carceral

context.[6] See TAC ¶ 36. Many courts in this Circuit have recognized such a right, in the context

of the transportation of mobility-impaired incarcerated plaintiffs to and from their place of

incarceration. See, e.g., Sayers, 2007 WL 914581, at *8 (finding a material issue of fact as to

"whether plaintiff was denied the benefit of safe transportation by reason of his disability," based

on evidence that his wheelchair was not properly secured during a van ride between a courthouse

and a pretrial detention facility, resulting in his injury); Shariff v. Goord, No. 04-CV-6621, 2005

WL 1863560, at *6 (W.D.N.Y. 2005) (holding that a wheelchair-bound plaintiff sufficiently

alleged a denial of service by reason of his disability by claiming that his wheelchair was not

suitable to provide for his safe transportation by van from his prison to an outside medical

facility, and that he was consequently physically injured when the van made a sharp right turn);

---

    [6] Section 504 of the Rehabilitation Act and Title II of the ADA are applicable to inmates
in state prisons. See Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206 (1998) (ADA);
Clarkson v. Coughlin, 898 F. Supp. 1019, 1035 (S.D.N.Y.1995) (Rehabilitation Act).

Allah v. Goord, 405 F. Supp. 2d 265, 271, 280–81 (S.D.N.Y. 2005) (holding that a wheelchair-bound plaintiff sufficiently alleged a denial of service by reason of his disability when he was transported to an outside medical facility in a van in which his wheelchair was not properly secured, resulting in his injury); cf. Morales v. City of New York, No. 13-CV-7667, 2016 WL 4718189, at *8 (S.D.N.Y. Sept. 7, 2016) (finding a material issue of fact as to Plaintiff's ADA claim based on evidence that, subsequent to arrest, the defendants transported plaintiff in a police van without property safety equipment, even though no injury resulted). While these cases involve safety issues in transit, the principle from these cases should apply, because entering and exiting the patrol car are parts of the transportation process.

Defendants focus on the service of transportation, broadly, and argue that because Plaintiff was not entirely precluded from participating in this service, he does not have a viable claim. See Defs.' Mem. of Law at 12; Reply Mem. of Law at 5. But "if he is at risk of incurring serious injuries each time he attempts to take advantage of" this service, then he is denied the "benefits" of the service. See Allah, 405 F. Supp. 2d at 280; see also 42 U.S.C. § 12132 (providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in *or be denied the benefits of* the services, programs, or activities of a public entity") (emphasis added). To support their argument, Defendants rely on Woods v. City of Utica, 902 F. Supp. 2d 273 (N.D.N.Y. 2012). In that case, the plaintiff's claim that his transportation from the scene of his arrest to a police station in the passenger seat of a police car violated the ADA was defeated at the summary judgment stage. See id. at 280. But the plaintiff did not allege that transportation by patrol car was unsafe, let alone that he had suffered any injury. See id. Those facts are hardly analogous.

15

There are genuine factual disputes bearing on the safety of patrol car transport for Plaintiff, in light of his paraplegia. Defendants dispute, first, whether Plaintiff suffered any injury on January 4, 2016. In an attempt to refute Plaintiff's factual claim that this occurred, Defendants submit affidavits from various officers who managed his patrol car transport, in which they state that they do not recall or know of any incident in which Plaintiff "fell" during a transport. See, e.g., Allison Aff. ¶¶ 7–8; Curtis Aff. ¶¶ 7–8; Eldridge Aff. ¶¶ 7–8. There is a possible semantic distinction between Plaintiff "falling," and Plaintiff, in his words, "slipping." See Dickinson Dep. at 42. Accordingly, there is arguably no dispute at all. But even if the two terms were understood as equivalent, Plaintiff's competing sworn statement that the injury occurred would create a genuine factual dispute, precluding summary judgment. See, e.g., Gen. Elec. Capital Corp. v. NET Transportation, Inc., No. 04-CV-316, 2006 WL 8447262, at *3 (D. Conn. May 4, 2006) ("In ruling on summary judgment, the Court cannot credit averments made in plaintiff's affidavit over that of the defendants.").

Defendants point to other evidence meant to cast doubt on either the fact or the severity of the alleged injury. Defendants highlight Plaintiff's pre-existing shoulder injuries and admitted "wear and tear" from his daily transfers to and from his wheelchair. See Defs.' SMF ¶¶ 11–14; Defs.' Mem. of Law at 11–12. But this evidence does not conclusively debunk Plaintiff's factual claims, and precisely what weight to assign this evidence is a question for the jury. See Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003) (noting that "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment") (internal quotation marks and citations omitted). The same is true with respect to Defendants' emphasis on Plaintiff's admission that he

frequently transfers between his wheelchair and other objects, such as his bed, without incident. See Defs.' Mem. of Law at 12. Plaintiff explained in his deposition that there are certain differences between those transfers and the transfer between his wheelchair and the patrol car. For instance, Plaintiff maintains that he cannot bring his wheelchair as close to the patrol car seat as to these other objects and emphasizes that he always transfers to these other objects using a handrail, something plainly not available for transfers to the patrol car. See Dickinson Dep. at 26–28, 72. Determining precisely how relevant these differences are requires the weighing of evidence and the assessment of credibility, tasks beyond the purview of summary judgment.

Moreover, whether the injury occurred and the extent of the injury are only indirectly relevant, as evidence of a *risk* of injury. The risk of injury attending patrol transport itself potentially amounts to denial of the benefits of the service of transportation. See Allah, 405 F. Supp. 2d at 280 ("Although plaintiff is not wholly precluded from participating in this service, if he is at risk of incurring serious injuries each time he attempts to take advantage of outside medical attention, surely he is being denied the benefits of this service."); cf. Cohen v. City of Culver City, 754 F.3d 690, 700 (9th Cir. 2014) ("Obstructed sidewalks exclude disabled persons from ordinary communal life and force them to risk serious injury to undertake daily activities. This is precisely the sort of subtle discrimination stemming from thoughtlessness and indifference that the ADA aims to abolish.") (internal citations and quotation marks omitted); Choate, 469 U.S. at 295 ("Discrimination against the handicapped was perceived by Congress to be most often the product . . . of thoughtlessness and indifference—of benign neglect.").

And as far the *risk* itself is concerned, the November 4, 2015 videos leave room for doubt about the safety of the transportation process. If these videos were representative of all transfers,

as Defendants assert, the Court could not find as a matter of law that Plaintiff was provided with the benefit of safe transportation. In both the transfer to the patrol car and the transfer back to the wheelchair, there are moments in the process that arguably appear haphazard, in which Plaintiff conceivably could injure himself. See Video I, 9:42:44–9:43:15; Video II, 10:33:33-10:34:15. A reasonable jury could find that the process depicted in these videos poses a sufficient risk of physical injury to amount to a denial of the benefit of safe transportation. Cf. Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

Moreover, Defendants' failure to produce video from January 4, 2016 (despite video cameras being installed in the area in which the transfers would have occurred), leaves room for the jury to determine that the transfer process on January 4, 2016 transpired differently in some respect from the November 4, 2015 process. Defendants emphasize Plaintiff's supposed admission that the "same procedure" was followed in every transfer as in the November 4, 2015 videos. See Dickinson Dep. at 61; see also Defs.' Mem of Law at 12 (asserting that Plaintiff "admitted" the November 4 videos were "representative of all transfers he made at the WCCF"). But there is no record of Plaintiff having been shown these videos in the deposition and prompted to remark on what they depict, and thus no reason for the Court to believe that he made the precise representation Defendants attribute to him. And that the "same procedure" was followed each time is not necessarily inconsistent with there being variations in the details of the process. To determine what exactly occurred on January 4, 2016, the jury may have to assess the

18

credibility of witnesses or weigh other evidence apart from the November 4, 2015 videos.

As for whether Plaintiff's requested accommodation of a wheelchair-accessible van is reasonable, the Court finds that Plaintiff has met his initial burden of production. Plaintiff must show that "the costs [of a wheelchair-accessible van], facially, do not clearly exceed its benefits." Henrietta D., 331 F.3d at 280. The potential benefits are clear. If a wheelchair-accessible van had been available, Plaintiff would have been able to board the van without leaving his wheelchair, which would have eliminated any risk of injury in the transfer process. See Mot. Ex. D at 4. And that these benefits would justify the costs is suggested by the fact that, by Plaintiff's recollection, several New York State correctional facilities he has attended, including Shawangunk Correctional Facility, Marcy Correctional Facility, Franklin Correctional Facility, Groveland Correctional Facility, and Livingston Correctional Facility, had wheelchair-accessible vans available. See Dickinson Dep. at 33–34. Policymaking officials evidently decided that the costs of a wheelchair-accessible van did not clearly exceed the benefits at those facilities. Plaintiff has accordingly met his "light" initial burden of production. See Wright, 831 F.3d at 76.

The burden now shifts to Defendants, who argue that acquiring a wheelchair-accessible van would impose an undue financial and administrative burden. See Defs.' Mem. of Law at 13–14. Defendants submit an affidavit from York in which he estimates, "upon information and belief," that a wheelchair-accessible van would cost over $50,000. York Aff. ¶ 16. Defendants also submit an affidavit from Clifford, in which he attests, again "upon information and belief," that "I recall no more than two wheelchair-bound inmates (including inmate Dickinson) who were incarcerated at the WCCF" during Clifford's fifteen-year tenure at the facility. Dkt. No.

19

83-10 ("Clifford Affidavit") ¶ 16. York adds that, to the extent Plaintiff suggests a wheelchair van should be rented specifically for him, this "is not routinely practical given the special circumstances and safety protocols of a correctional facility." York Aff. ¶ 17.

Defendants have decidedly failed to meet their burden to demonstrate undue hardship. Sworn statements made on "information and belief," upon which Defendants' argument entirely depends, are not competent evidence at the summary judgment stage, because they are not based on personal knowledge. See Estate of Gustafson v. Target Corp., 819 F.3d 673, 677 n.4 (2d Cir. 2016) ("Affidavits submitted in opposition to summary judgment must 'be made on personal knowledge,' and that requirement is 'not satisfied by assertions made on information and belief.'") (quoting Fed. R. Civ. P. 56(c)(4); Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004)). Clifford's sworn statement might be based to some extent on his personal recollection, but the confusing and contradictory inclusion of "upon information and belief" suggests, at the least, that he is not confident enough in his memory to swear to what he purportedly recalls on penalty of perjury. See Harris v. Gonzales, 488 F.3d 442, 446 (D.C. Cir. 2007) ("Two of the affidavits state, '[t]o the best of my knowledge and belief, I recall seeing an EEO poster displayed.' . . . This . . . leaves us wondering whether the affiants actually saw the EEO posters."). And in suggesting that Plaintiff requests a wheelchair-accessible van solely for his own use, which might indicate a disproportionate financial or administrative burden, Defendants misrepresent Plaintiff's position—he requests simply that a van be available to him.

Defendants also devote significant ink to enumerating all of the accommodations they *did* provide. Defendants explain that they, for instance, relaxed safety protocols applicable to other inmates by enabling Plaintiff to have his hands free of restraints during transports, assigned two

20

officers to assist him in transfers, and allowed Plaintiff to sit in the front of a patrol car rather

than the back of a transport van. See York Aff. ¶ 11; Defs.' SMF ¶¶ 22–27. Defendants appear to

believe that every deviation from standard procedure for the benefit of a person with a disability

is a legally gratuitous act of grace. Rather, Defendants have a legal obligation to eliminate

barriers to government services that confront incarcerated people with disabilities, and

accommodations that are not effective toward this end do not establish compliance with the

ADA and the Rehabilitation Act. See Henrietta D., 331 F.3d at 273 ("[A]n otherwise qualified

handicapped individual must be provided with meaningful access to the benefit that the grantee

offers. . . . To assure meaningful access, reasonable accommodations in the grantee's program or

benefit may have to be made.") (quoting Choate, 469 U.S. at 301); Dean v. Univ. at Buffalo Sch.

Of Med. & Biomedical Scis., 804 F.3d 178, 189 (2d Cir. 2015) ("The hallmark of a reasonable

accommodation is effectiveness.").

     As Defendants correctly argue, there is no individual liability under the ADA or the

Rehabilitation Act. See Defs.' Mem. of Law at 10; see also Garcia, 280 F.3d at 107 ("[N]either

Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits

against state officials."). Plaintiff's ADA and Rehabilitation Act claims against official

defendants thus fail as a matter of law.

     Regarding Plaintiff's claims for damages against Warren County, the Second Circuit has

held that "a private suit for money damages under Title II of the ADA may only be maintained

against a state if the plaintiff can establish that the Title II violation was motivated by either

discriminatory animus or ill will due to disability." Garcia v. S.U.N.Y. Health Sciences Center of

Brooklyn, 280 F.3d 98, 111 (2d Cir. 2001). In light of subsequent case law, it is unclear whether

this holding from <u>Garcia</u> is valid. <u>See, e.g.</u>, <u>Olson v. State of New York</u>, No. 04-CV-419, 2007

WL 1029021, at *7 (E.D.N.Y. Mar. 30, 2007) (noting that subsequent Supreme Court precedent

calls the validity of <u>Garcia</u> into question); <u>Dean</u>, 804 F.3d at 194 (same); <u>Alster v. Goord</u>, 745 F.

Supp. 2d 317, 339 (S.D.N.Y. 2010) (holding that an action for monetary damages under Title II

of the ADA is permitted for a reasonable accommodation claim, without a showing of

discriminatory animus). Because Defendants do not raise this argument in their summary

judgment brief, the Court will not entertain dismissal on this ground. <u>See</u> <u>ING Bank N.V. v. M/V</u>

<u>Temara</u>, 892 F.3d 511, 524 (2d Cir. 2018) ("A notice-free, *sua sponte* entry of summary

judgment is firmly discouraged and is limited only to situations when there is no indication that

the party against whom summary judgment would be entered could present evidence that would

affect the summary judgment determination.") (internal quotation marks omitted).


　　　While Defendants have not urged dismissal on mootness grounds, the Court dismisses

Plaintiff's ADA and Rehabilitation Act claims for injunctive relief *sua sponte,* because these

claims are rendered moot by his transfer out of Warren County C.F. <u>See</u> <u>Irish Lesbian & Gay</u>

<u>Org. v. Giuliani</u>, 143 F.3d 638, 648 (2d Cir. 1998). ("[A] federal court should refuse to hear a

case that no longer presents a live case or controversy regardless of whether any party has urged

dismissal."); <u>Day v. Chaplin</u>, 354 F. App'x 472, 474 (2d Cir. 2009) ("Because Day is no longer

housed at [Garner Correctional Institution], his claims for injunctive relief are moot.").

　　　Accordingly, with respect to Plaintiff's ADA and Rehabilitation Act claims predicated on

unsafe transportation, Defendants' Motion is denied as to Plaintiff's claims for money damages

against Warren County, and is otherwise granted.

b.  <u>Shower Chair and Uniform</u>

Plaintiff alleges that he was denied a waterproof shower chair and a two-piece uniform, and that these amounted to denials of reasonable accommodations. In both instances, there is undisputed evidence that Defendants provided the requested accommodations, albeit not immediately. Defendants' sole argument on this point is simply that they provided the requested accommodations. <u>See</u> Defs.' Mem. of Law at 10 n.4.

With respect to the shower chair, Defendants submit an invoice dated August 26, 2015 for the purchase such a chair. <u>See</u> Mot. Ex. C. Slater attests that Plaintiff received the chair within a month of his arrival, which is consistent with the date of the invoice. <u>See</u> Slater Aff. ¶ 16. Slater attests that in the interim, Plaintiff was assisted by medical or correctional staff with showering. <u>See id.</u> Plaintiff does not contest the authenticity of the invoice or the veracity of these sworn statements.

Regarding the uniform, it appears Warren County C.F. officials provided the accommodation after some delay. Plaintiff requested this accommodation on September 22, 2015. <u>See</u> Mot. Ex. D at 19. By Plaintiff's account, within two or three weeks, he received a used two-piece uniform, which he understood to be a temporary uniform pending the purchase of a new one. <u>See</u> Dickinson Dep. at 111. There is documentary evidence that Warren County C.F. received a new uniform on November 2, 2015. <u>See</u> Mot. Ex. B. Plaintiff recalls that this initial set of clothes was too small. <u>See</u> Dickinson Dep. at 110. There is documentary evidence that Defendants ordered a second uniform, which the facility received on December 28, 2015. Mot. Ex. B. Plaintiff does not appear to dispute that he received this uniform around that date or that it was the correct size.

Defendants delayed in providing these accommodations, but not to an extent that violates the ADA or the Rehabilitation Act. "[U]nreasonable delay may amount to a failure to provide reasonable accommodations." Valle-Arce v. Puerto Rico Ports Auth., 651 F.3d 190, 200-201 (1st Cir. 2011); see also Mogenhan v. Napolitano, 613 F.3d 1162, 1168 (D.C. Cir. 2010) ("[T]here are certainly circumstances in which a long-delayed accommodation could be considered unreasonable and hence actionable under the ADA.") (internal quotation marks omitted). Whether a delay is unreasonable is a fact-specific inquiry, and can depend on a variety of factors, including the length of the delay, and whether the defendant has provided alternative accommodations in the interim. Cf. Selenke v. Medical Imaging of Colo., 248 F.3d 1249, 1262–63 (10th Cir. 2001) (collecting cases in the employment context). Defendants concede that Plaintiff's requested accommodations were necessary in light of his disability, and that they were reasonable, and the Court agrees. But because it is undisputed that Defendants provided these accommodations within a few months and provided alternative accommodations in the interim, summary judgment is granted as to Plaintiff's ADA and Rehabilitation Act claims related to these two accommodation requests.

## B.  Fourteenth Amendment Due Process Claims

The Court now turns to Plaintiff's Fourteenth Amendment due process claims pertaining to allegedly unconstitutional conditions of confinement. The Court first discusses general standards applicable to Fourteenth Amendment conditions-of-confinement claims. The Court then identifies which of the many officials named in the Third Amended Complaint were involved in the alleged unconstitutional conduct. This is followed by an analysis of Plaintiff's Fourteenth Amendment claim against the single personally involved official defendant, York.

24

Finally, the Court addresses Warren County's liability under Monell. In short, only Plaintiff's Monell claim against Warren County may proceed.

### 1. *Fourteenth Amendment Standards*

Section 1983 "provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting § 1983). "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment. See Darnell v. Pineiro, 849 F.3d 17, 29 (2d. Cir. 2017). A pretrial detainee's claim must satisfy two prongs—an "objective" prong, showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a "subjective" prong, showing that the officer acted with at least "deliberate indifference" to the challenged conditions. See id.

To satisfy the "objective" prong, the plaintiff must show that he was made to endure conditions that, "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health . . ., which includes the risk of serious damage to physical and mental soundness." Id. at 30 (internal quotation marks and citations omitted). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." Id.

In the context of Fourteenth Amendment conditions-of-confinement claims, "deliberate indifference" has a meaning distinct from that in Eighth Amendment jurisprudence: a plaintiff

can satisfy the subjective prong not just by showing that the defendant actually knew of and disregarded the relevant risk, but also, alternatively, by showing that the defendant disregarded a risk of which he reasonably should have known. See id. at 29, 35.

### 2. Personal Involvement

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)). "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a custom or policy under which unconstitutional policies occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." Colon, 58 F.3d at 873.

Plaintiff names a number of officials as defendants. Officers Mason, Green, Reynolds, Smith, Pond, Harpp, Trottier, Slater, Curtis, Wittenburg, Lemelin, Sorenson, Mattison, Allison, Hill, Vandeburg, Eldridge, and Hoerter, and Sergeant Keays were all at some time involved in assisting with Plaintiff's transport by patrol car. See Dickinson Dep. at 87; Affidavits. Plaintiff

has clarified that he does not allege that any individual transport officer committed unconstitutional conduct in the course of transport. See Dickinson Dep. at 87 (stating that he "didn't have any issues with how they transported [him]"). Rather, his claims stem from injury consequent to the decision to compel him to travel via patrol car rather than wheelchair-accessible van, due to physical risks inherently associated with the transfer process. See id. Plaintiff has not alleged that these officials were involved in any decision to compel Plaintiff to travel by patrol car or in any failure to purchase a wheelchair-accessible van. Based on Plaintiff's clarification, the Court grants summary judgment as to these thirteen defendants, because they lacked personal involvement in the alleged constitutional violation.

York's liability appears to be predicated on his alleged power to determine policy regarding inmate transportation, and his failure to obtain a wheelchair-accessible van for the facility. Plaintiff states that despite being aware of applicable laws and regulations pertaining to disability accommodations, "Sheriff York . . . refuse[d] to give [Plaintiff] proper and safe transportation." TAC ¶ 28.

Plaintiff attests to certain facts intended to establish York's notice of the alleged Constitutional violations. Plaintiff states that he filed a grievance on November 10, 2015 regarding the patrol car issue, see Mot. Ex. D at 3–8, and that York was aware of this grievance. See TAC ¶ 33. Further, Plaintiff states that Reynolds told York of the need for a wheelchair-accessible van. Id. York also, according to Plaintiff, made a statement in The *Post-Star* newspaper related to wheelchair accessible transport. Id.[7] Additionally, DRNY informed York of Plaintiff's request for a wheelchair-accessible van and advised York that this accommodation

---

[7] Plaintiff does not provide any additional information about this news article.

was required by the ADA. Id. York states that he is aware of Plaintiff's request for a wheelchair-accessible van but does not specify how he became aware. See York Aff. ¶ 10 ("I am aware that Plaintiff made a number of requests to be transported by a wheelchair accessible van rather than the patrol car."). He states, "upon information and belief," that DRNY visited Warren County C.F. in or around the summer of 2016 upon Plaintiff's invitation, and that during DRNY's visit, wheelchair-accessible transportation was discussed. See id. ¶ 11. He acknowledges that he authorized this inspection and reviewed DRNY's recommendations, some of which pertained to wheelchair accessibility. See id. York denies that Plaintiff "communicated with" him "relating to any requests or concerns regarding a wheelchair accessible van." See id. ¶ 14.

Defendants have failed to establish the absence of a genuine dispute regarding York's personal involvement in the alleged constitutional violation. York does not deny that he possessed the authority to determine how Plaintiff would be transported or to obtain a wheelchair-accessible van for the facility. Indeed, he appears to imply that he did have some influence in shaping the relevant decisions. He states his "responsibilities include overseeing the operations of the Warren County Correctional Facility," see York Aff. ¶ 2, which plausibly entails the power to determine transportation procedure. And in describing his role is reviewing DRNY's recommendations pertaining to wheelchair accessibility, he seems to imply that he had the authority to implement such changes or decline to do so. York has, in other words, failed to show the absence of a genuine dispute as to whether he "participated directly in the alleged constitutional violation" of failing to make a wheelchair-accessible van available to Plaintiff for transportation between the jail and the courthouse. See Colon, 58 F.3d at 873.

With respect to Clifford and Maday, Plaintiff states that "[b]oth were made aware of

what Title II of the ADA states and both ignored countless attempts by [Plaintiff] to seek help in correcting the transportation barrier [Plaintiff] was faced with." TAC ¶ 11. Regarding Maday, Plaintiff elaborates that he spoke to "the head nurse Jamie," who then spoke with Maday on the phone on January 26, 2016 about Plaintiff's concerns regarding patrol car transportation. Id. ¶ 21. Maday told Jamie "'he was waiting to hear from Albany about the issue' and . . .'he would let her know what [A]lbany said when they call him back.'" Id. Jamie subsequently informed Plaintiff that Maday never called her back. Id. Additionally, Plaintiff "informed Lt. Maday several other times in person" of the same issue. Id. ¶ 33. Clifford, for his part, "knew of the issue of the wheelchair van because he received a letter from the Inspector General" regarding this issue and others, and because Plaintiff had a conversation with Clifford about the need for a wheelchair-accessible van to ensure that "people in wheelchairs have safe transportation." Id.

Plaintiff does not specifically allege that either Clifford or Maday played any role in the decision to compel Plaintiff to travel in the patrol car or in the failure to purchase a wheelchair-accessible van, or that they even had the authority to influence any such decisions. See generally TAC. And based on these defendants' self-descriptions of their job responsibilities, there is no indication that they were necessarily so involved. See Dkt. Nos. 83-10 ("Maday Affidavit") ¶ 3 ("My job responsibilities as Lieutenant include the supervision of Sergeants and day-to-day activities throughout the [Warren County C.F.] along with reporting directly to the administrator of the [Warren County C.F.] regarding any issues as it pertains to the supervision of all WCCF inmates."); 83-21 ("Clifford Affidavit") ¶ 3 (same). At best, Maday and Clifford had a mere "linkage" through "the prison chain of command" to lower-level officials who managed Plaintiff's transport, which does not on its own constitute personal involvement in the alleged

29

wrong. See Polk Cty. v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003).

Farmer, for his part, "was the supervisory official who gave [O]fficer Reynolds a direct order to put [Plaintiff] in the patrol [car] after [O]fficer Reynolds informed Sergeant Farmer it was unsafe and violates [P]laintiff's Constitutional rights and it was demoralizing and inhumane to force [P]laintiff to crawl in and out of the patrol car." TAC ¶ 16. "[O]n April 6, 2016 Sergeant Farmer gave a direct order to [O]fficer Hill and officer Allison to have [P]laintiff transfer from his wheelchair to the backseat of the patrol car," before Plaintiff was ultimately permitted to ride in the front seat, roughly thirty minutes later. Id. ¶ 17; see also Dickinson Dep. at 56 ("I was told . . . that I had to get into the back of the patrol car by officer Allison because Sergeant Farmer had said that because we got a bigger car he can get in the backseat now."). Farmer does not specifically respond to Plaintiff's allegations regarding Farmer's role in the alleged April 6, 2016 events, but he does generally deny any personal involvement "in any transport of Plaintiff to and from [Warren County C.F.]." See Dkt. No. 83-13 ("Farmer Affidavit") ¶ 4. Farmer confirms that he has what could be fairly described as supervisory authority over correction officers. Id. ¶ 3 ("My duties as Correction Sergeant included, but were not limited to . . . issu[ing] oral and written orders to COs under my supervision."). He also confirms that he was "aware that Plaintiff did file grievances . . . regarding his request to be transported by a wheelchair accessible van rather than a patrol car." Id. ¶ 4.

Defendants have established the absence of a genuine dispute regarding Farmer's personal involvement. Plaintiff attests that Farmer ordered Hill and Allison to place Plaintiff in the patrol car. But this statement, which describes a conversation Plaintiff did not witness, is

inadmissible hearsay and thus not competent evidence. See Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge, and a hearsay affidavit is not a substitute for the personal knowledge of a party[.]") (internal citations omitted); Hamilton v. City of New York, No. 15-CV-4574, 2019 U.S. Dist. LEXIS 56606, at *34–35 (E.D.N.Y. Mar. 18, 2019) ("The Court agrees that Mattie Dixon's descriptions of conversations that took place between White and Alphonso Dixon, as relayed to her by Alphonso Dixon, are inadmissible hearsay for the purpose of establishing that such conversations took place as described. Accordingly, the Court does not rely on factual statements made in Mattie Dixon's affidavit[.]"). Since Farmer's opposing sworn statement that he played no role in any instance of Plaintiff's transport *is* competent evidence, there is no genuine dispute on the matter.

Accordingly, based on the undisputed facts, only York was personally involved in the alleged constitutional violation.

### 3. *York's Liability*

While York has failed to demonstrate the existence of a genuine dispute of material fact as to whether he violated the Fourteenth Amendment, he has established his entitlement to qualified immunity.

#### a. Objective Prong

In addressing the objective prong of Plaintiff's Fourteenth Amendment claim, Defendants assert that Plaintiff was not injured on January 4, 2016, and that he was never at significant risk of injury. See Defs.' Mem. of Law at 15–16. Defendants rely on Plaintiff's admissions that he had pre-existing shoulder problems and that he transferred himself from his wheelchair to other

31

surfaces regularly without frequent injury. See id. For reasons already discussed, assigning proper weight to this evidence is beyond the scope of summary judgment, given Plaintiff's competent evidence in opposition. There is room for reasonable jurors to disagree about whether the January 4, 2016 injury occurred, precisely how severe the injury was, and how much risk the transfer process entailed as a general matter. Defendants present no other arguments and cite no legal authorities.

Without more, Defendants fail to demonstrate the absence of a genuine dispute as to whether Plaintiff's conditions of confinement posed "an unreasonable risk of serious damage to his health." See Darnell, 849 F.3d at 29. He attests that he required two "shots" to relieve "serious pain" in his back subsequent to the January 4, 2016 incident, and that his pain lasted for at least several weeks. See TAC ¶ 25. A reasonable jury could find that the objective prong is satisfied under these circumstances. Cf. Allah, 405 F. Supp. 2d at 275–77 (holding that Plaintiff sufficiently alleged the objective prong based on allegations that his wheelchair was not properly secured during transports, and that he consequently fell to the floor of a van, suffering "serious injury to his head, neck, and back") (internal alterations omitted).

With respect to Plaintiff's Fourteenth Amendment arguments based on the alleged failures to provide a shower chair and a two-piece uniform, Defendants correctly argue that these injuries do not satisfy the objective prong. See Defs.' Mem. of Law at 16. These short-lived deprivations, softened by alternative interim accommodations, were not sufficiently serious. See, e.g., McGee v. Pallito, No. 10-CV-11, 2011 WL 6291954, at *13 (D. Vt. Aug. 3, 2011) ("The length of time a prisoner is subjected to harsh conditions is a critical factor in our analysis.") (internal quotation marks omitted), report and recommendation adopted, No. 10-CV-11, 2011

WL 6294202 (D. Vt. Dec. 15, 2011); Jean-Laurent v. Lawrence, No. 12-CV-1502, 2013 WL

1129813, at *6 (S.D.N.Y. Mar. 19, 2013) ("Plaintiff does not allege that he was forced to wear

dirty clothing, however, so much as that he lacked clothing while his set was being washed.

Forcing a prisoner to go without socks or underwear for short periods while the clothing is being

washed does not rise to the level of cruel and unusual punishment."); Gill v. Riddick, No. 03-CV-

1456, 2005 WL 755745, at *16 (N.D.N.Y. Mar. 31, 2005) (holding that temporary deprivation of

the right to use the toilet did not rise to the level of an Eighth Amendment violation because

there was no "serious physical harm"); Fernandez v. Armstrong, No. 02-CV-2252, 2005 WL

733664, at *5 (D. Conn. Mar. 30, 2005) (denial of hygiene items, including soap, for sixteen days

did not did not amount to a violation of the Eighth Amendment).

### b.  Subjective Prong

Defendants argue, with respect to Plaintiff's transportation-related claim, that no

defendant exhibited recklessness, because prison officials made various accommodations aside

from providing a wheelchair-accessible van. See Defs.' Mem. of Law at 15–16. Defendants

maintain they made certain exceptions from safety protocols in allowing Plaintiff to ride in a

patrol car as opposed to a transport van, and highlight that two officers were always present to

assist Plaintiff with transfers. See York Aff. ¶ 11; Defs.' SMF ¶¶ 22–27. But the relevant

question, which Defendants do not address, is whether York knew or should have known that

these measures were insufficient to preclude an unreasonable risk of serious physical injury; the

mere fact of some accommodation, however inadequate, does not in itself show that York was

not reckless in failing to provide a wheelchair-accessible van, which uniquely would have

eliminated the need for transfers from the wheelchair to the vehicle. See Alster, 745 F. Supp. 2d

33

at 336 ("The State Defendants contend that because they provided certain accommodations,

Alster cannot establish a culpable state of mind. This misapprehends the law. An official's

provision for certain of an inmate's basic needs cannot immunize him where he deprives that

inmate of other life necessities guaranteed by the Eighth Amendment."). In neglecting to address

this question, Defendants fail to establish their entitlement to summary judgment.

### c. Qualified Immunity

Defendants argue that York is entitled to qualified immunity. See Defs.' Mem. of Law at

18–20. Defendants are correct. While there is no material factual dispute as to whether York

violated Plaintiff's Fourteenth Amendment right to due process, the relevant legal principles

were not clearly established at the time of the violation.

Qualified immunity "shields public officials performing discretionary functions from civil

liability insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known, or insofar as it was objectively

reasonable for them to believe that their acts did not violate those rights." Bradway v. Gonzales,

26 F.3d 313, 317–18 (2d Cir. 1994) (internal citations and quotation marks omitted). In

determining whether a particular right was clearly established at the time the official acted, the

Second Circuit asks "(1) whether the right in question was defined with reasonable specificity;

(2) whether the decisional law of the Supreme Court and the applicable circuit court support the

existence of the right in question; and (3) whether under preexisting law a reasonable defendant

official would have understood that his or her acts were unlawful." Back v. Hastings On Hudson

Union Free Sch. Dist., 365 F.3d 107, 129–30 (2d Cir. 2004) (internal quotation marks omitted).

There is case law from lower courts in this Circuit indicating that a person who has been

arrested or incarcerated can establish a claim under the Eighth or Fourteenth Amendments for physical injury resulting from transportation in a manner that is unsafe in light of the plaintiff's disability. See, e.g., Allah, 405 F. Supp. 2d at 275–77 (holding that an incarcerated plaintiff with paraplegia stated a claim under the Eighth Amendment based on physical injury due to the improper securement of his wheelchair during transport to an outside medical facility); Sayers, 2007 WL 914581, at *6–7 (denying defendant's motion for summary judgment as to a Monell "failure-to-train" claim based on a pretrial-detainee plaintiff's injury consequent to the improper securement of his wheelchair during transport from a courthouse to a jail); cf. Candelaria v. Greifinger, No. 96-CV-17, 1998 WL 187383, at *3 (N.D.N.Y. Apr. 15, 1998) (holding that an incarcerated plaintiff with paraplegia stated an Eighth Amendment claim based partly on the allegation that his facility denied him medical care by failing to provide a wheelchair-accessible van capable of safely transporting him to outside medical appointments).

The facts of this case are novel, in that Plaintiff alleges injury during the process of transfer to and from the vehicle, as opposed to injury in transit. The uniqueness of the facts does not alone establish York's entitlement to qualified immunity, as the Supreme Court has held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 740–41 (2002). Even so, in order to overcome qualified immunity, a plaintiff must show that existing precedent has "placed the . . . constitutional question beyond debate." White v. Pauly, 137 S. Ct. 548, 551 (2017). Since Plaintiff's claim is not only novel, but also relies on lower-court case law, which is persuasive rather binding, the right in question was not clearly established at the time of the violation.

Accordingly, York is entitled to qualified immunity as to Plaintiff's Fourteenth

Amendment claim for damages.[8]

### 4. *Warren County's Liability under Monell*

Even though all official defendants escape liability, Warren County does not. There is undisputed evidence that Warren County maintains a policy of transporting all inmates at Warren County C.F. by means other than wheelchair-accessible van, regardless of mobility impairment; and Defendants have failed to demonstrate the absence of a genuine factual dispute as to whether this policy caused the alleged violation of Plaintiff's Fourteenth Amendment right to due process.

A municipality "may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 563 U.S. 51, 60 (2011) (citing Monell, 436 U.S. at 692). "Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality." Askins v. Doe, 727 F.3d 248, 253 (2d. Cir. 2013). At the same time, a plaintiff need not obtain a judgment against any individual employee tortfeasor in order to establish the liability of the municipality; the former may, for instance, be protected by qualified immunity, a doctrine that cannot protect the latter. See id. A plaintiff need not even name the individual tortfeasors as defendants. See id.

A plaintiff must establish that a constitutional violation occurred because of a specific municipal policy or custom. See Monell, 436 U.S. at 694-95. Any of the following may satisfy the "policy or custom" requirement:

---

[8]  Plaintiff's claim for injunctive relief is dismissed as moot. See supra Part IV(A)(2)(a).

> (1) a formal policy that has been officially endorsed by the municipality, <u>Monell</u>, 436 U.S. at 694; (2) an action taken by an official who is responsible for establishing municipal policies with respect to the subject matter in question, <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483-84 (1986); (3) a widespread practice that is so "permanent and well settled as to constitute a 'custom or usage' with the force of law," <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988); or (4) a failure to train, supervise, or discipline that "amounts to a deliberate indifference to the rights of persons with whom [officials] come into contact," <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989).

<u>Acquah v. City of Syracuse</u>, No. 18-CV-1378, 2019 WL 3975463, at *4 (N.D.N.Y. Aug. 22, 2019) (Kahn, J.).

Defendants argue that Plaintiff has failed to point to a policy pursuant to which his alleged constitutional injury was inflicted. <u>See</u> Defs.' Mem. of Law at 17. But Plaintiff clearly targets Warren County's policy of refusing to provide a wheelchair-accessible van to inmates at Warren County C.F., and instead transporting all inmates at Warren County C.F., including those in wheelchairs, by patrol car or transport van. <u>See</u> TAC ¶ 21 (alleging that the facility refused to acquire a wheelchair-accessible van); ¶ 28 (alleging that "York and his staff" have refused to provide wheelchair-accessible accommodation since the facility's founding); ¶ 32 (noting that Plaintiff "was told that the facility was not paying for" a wheelchair-accessible van).

Such a policy, whether written or unwritten, clearly exists. Not only have defendants at various levels of the administrative hierarchy submitted affidavits confirming the existence of this policy; Defendants explicitly defend the policy. <u>See, e.g.,</u> Allison Aff. ¶¶ 4–8 (noting that "[t]ypically, when inmates require a transport from the WCCF, to make such appointments as Court appearances, they ride in the back of a transport van and remain shackled throughout the transport process," while explaining that the facility adequately accommodated Plaintiff's

disability by providing a patrol car for transport); Clifford Aff. ¶¶ 6–7 (noting that "[a]s it pertains to the transport of inmates to and from the WCCF it is the policy and practice of Warren County that, for safety reasons, such inmates ride in the back of a transport van and remain shackled throughout the transport process," while explaining that the facility adequately accommodated Plaintiff's disability by providing a patrol car for transport); York Aff. ¶¶ 16–17 (explaining that Warren County has not purchased a wheelchair-accessible van for Warren County C.F., because such a vehicle is unjustifiably expensive and rarely necessary, and that Warren County declines to rent a wheelchair-accessible van as-needed, due to logistical and safety concerns). Defendants cannot consistently deny this policy's existence and advocate for its legality and practical necessity.

Defendants do not dispute that this policy caused the alleged constitutional harm, nor could they plausibly do so based on the evidentiary record. "Plaintiff is required to establish more than but-for causation . . . Plaintiff must demonstrate that the municipal 'policy' at issue was the 'moving force' behind [his] injuries." Anonymous v. City of Meriden, No. 10-CV-37, 2013 WL 2254181, at *5 (D. Conn. May 22, 2013) (quoting City of Canton, 489 U.S. at 389). Defendants have pointed to no evidence that tends to undermine "but-for" causation; the parties appear to agree that the transfer process in the course of which Plaintiff's physical injury allegedly occurred was necessary for patrol car transport and would not have been for transport by wheelchair-accessible van. As for proximate causation, Defendants have not demonstrated the absence of a genuine factual dispute as to whether the transfer process created a sufficient risk of serious physical injury. See supra.

38

Accordingly, Defendants have failed to demonstrate the absence of a material factual dispute as to Warren County's liability under the Fourteenth Amendment pursuant to <u>Monell</u>.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' summary judgment motion (Dkt. No. 83) is **GRANTED in part and DENIED in part.** Plaintiff's claims for damages against Warren County under the ADA, Rehabilitation Act, and § 1983 based on allegedly unsafe transportation via patrol car may proceed, while summary judgment is granted as to all other claims; and it is further

**ORDERED**, that the clerk shall **TERMINATE** from the docket all defendants other than Warren County; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        January 22, 2021
              Albany, New York

Lawrence E. Kahn
U.S. District Judge